A. F. PATTON AND VANN DORIS PATTON v. HENRY DAIL.

(Filed 27 April, 1960.)

**1. Evidence § 18—**

The origin of a fire causing the damages in suit may be established by circumstantial evidence.

**2. Negligence § 24c— Circumstantial evidence that fire was result of negligence of defendant held sufficient to be submitted to the jury.**

Evidence tending to show that defendant, pursuant to contract, made a plumbing connection under the floor of the bathroom in plaintiff's house, that the use of an open flame was necessary in soldering operations incident to the type of connection made, that some two hours prior to defendant's work the house was inspected and that no evidence of fire or smoke was found, that some one-half to two hours after the work was performed fire was seen underneath the house, together with evidence that the fire originated under the house directly beneath the bathroom floor where the work was done, *is held* sufficient to be submitted to the jury on the issue of whether defendant set the wood under the bathroom floor or its sills afire and whether he failed to take reasonable precautions to see that no flames or smouldering wood were present when he left the work.

**3. Same—**

Direct evidence of negligence is not required, but negligence may be inferred from the facts and attendant circumstances, and if the facts proven establish negligence and proximate cause as the more reasonable probability nonsuit cannot be entered notwithstanding that the possibility of accident may also arise on the evidence.

APPEAL by plaintiffs from *Sharp, S. J.,* November 1959 Assigned Civil Term, of WAKE.

Action for damages for the burning of a house allegedly caused by defendant's negligence.

From a judgment of compulsory nonsuit entered at the close of plaintiffs' evidence, plaintiffs appeal.

*Simms & Simms and Smith, Leach, Anderson & Dorsett for plaintiffs, appellants.*

*Teague, Johnson & Patterson for defendant, appellee.*

PARKER, J.  A. F. Patton is an electrical contractor. On 20 December 1958 he and his wife were the owners of a four and one-half room house with bathroom, located about five miles from the city of Raleigh, which they rented. Plaintiffs lived in the city. About 8:15 a. m. o'clock on this day defendant, who is a plumber, by contract with A. F. Patton met him at this house and replaced a spigot

in the kitchen. After defendant left, A. F. Patton turned on the water and discovered a leak under the house. A. F. Patton went under the house to find the leak, and found a bursted joint in the pipe under the bathroom. The bathroom was about 14 to 16 inches above the ground. The house had no basement. He turned the water off, and disconnected the electric hot water heater. He returned to the city about 9:15 a. m. o'clock and instructed defendant to go back and repair the leak.

About 10:00 a. m. o'clock on this day Bennett Rowland, who had rented this house from plaintiffs, began moving his furniture in. He finished moving about 2:30 p. m. o'clock, locked up the house, and left, because he had no oil to heat it, and would not have any until two days later. Before leaving he went into all the rooms to see if there was any evidence of fire or smoke, and found none. He heard of the fire the next day. Some of his furniture was burnt up, other parts of it were damaged by fire and smoke.

Between 4:30 and 5:30 p. m. o'clock defendant telephoned plaintiffs' daughter, Harriet Patton, and asked for her father. When she said he was out, defendant said he had completed the work at the house, but had not turned on the water.

About 6:00 or 6:30 p. m. o'clock on this day Emmett Bagwell and his wife driving to Raleigh were travelling along the road, which is approximately 50 yards from this house. He drove into some smoke, looked toward the house, and saw it was on fire underneath. He backed up, and went to Lewis Wilkins' to call the Garner Fire Department. He returned to the house. He testified on cross-examination: "When I got there it was fire underneath and burnt through the floor. The first thing I seen when I walked in there was fire underneath the house. I didn't see no hole in the floor. The fire burnt through the floor. I saw that hole, saw it when I first got there. I saw it from underneath the house."

Lewis Wilkins went to the house. He testified on direct examination: "The first flame I saw was under the house. It was burning both the timber under the house and also a little dry grass was burning. Yes I stayed there after that. We was trying to put water on it at that time and while we was trying to put water on it, the flames seemed to have broken loose inside the house then." On cross-examination he said: "I saw some burning timber under the house; that was directly under the bathroom. No other burning except under that area of the house, that's right. . . . I said it was approximately 6:30 when Mr. Bagwell stopped by my house. . . . I lived about 150 yards from the house."

W. R. (Jack) Johnson is chief of the Garner Fire Department. He and twelve firemen and fire fighting equipment went to this burning house. When he arrived, fire was coming out of the front gable and two windows on the Raleigh side of the house. A bedroom and the bathroom were on the Raleigh side of the house. The fire was concentrated in the area of the bedroom and bathroom, the worst damage was done in that area. He looked under the house. "The wood underneath the bathroom area of the house, the underpinning around the hole was charred somewhat." He had to put some fire out up under the house.

A. F. Patton heard of the fire, and arrived at the house about 7:00 or 7:15 p. m. o'clock. The Garner Fire Department was there fighting the fire. He went in the house. The whole front of the ceiling was burnt, and the firemen had knocked holes in the kitchen wall. One bedroom was badly burned, and another destroyed. There was evidence of fire in the attic all over the house. The bathroom was burned up, and there was a big hole, about 3½ feet in diameter, through the bathroom floor. "There were no other holes burnt through the floor anywhere in the house." He could see beneath the hole in the bathroom floor the piece of copper pipe defendant had replaced.

About 9:00 or 9:30 p. m. o'clock that night defendant told him "he had replaced a piece of copper pipe under the bathroom. . . . Mr. Dail did not say anything in his conversation with me with respect to how he formed that pipe. He just told me that he had sweated pipe at one end at the truck before he went under the house and made the last connection under the house. He told me he had replaced the bursted fitting with a piece of copper pipe. I know what is meant by saying that he sweated one end at the truck. It means sweating one end of the pipe into the adapter so when he went under the house he screwed it in the pipe because you cannot sweat and screw in after it is sweated. There were not more than two joints to this pipe. There is an electrical device that can be used to sweat a connection and make the solder joint. I don't think Mr. Dail said anything to me about what device he used."

A. F. Patton returned to this burned house during daylight, and examined the copper pipe defendant had replaced. He testified: "It had been connected up by the use of two copper adapters, copper to iron pipe adapters, sweat joint. The adapter is used to screw into a fitting of iron pipe. It is a galvanized pipe and to the end you slip the copper into it and sweat that joint. Sweat that joint means, that is used by a flame torch that you heat this pipe and adapter to a temperature and place your solder on it and it runs in and runs around the joint. Both ends of this pipe were attached that way. . . .

I have been in the electrical business since about 1932 or 1933. In that connection I have been connected with the construction trade and have had occasion to observe plumbing work being done. I am familiar with the usual accepted methods for doing the work of placing copper pipes to iron pipes, either a sweat joint or a flare fitting. On the pipe replaced by Mr. Dail, a sweat joint was used. I know the usual accepted method for making a sweat joint. Sweat joint is used most commonly and the flare joint is used most whenever they are connecting water heaters, some movable appliance. There was not any flare joint used in connection with this piece of pipe. . . . I am familiar with Mr. Dail's equipment. He and I have worked on jobs. The equipment he uses is the torch, open flame. The type of torch he uses is butane gas torches. That has an open flame when in operation."

The house was so badly burned plaintiffs did not repair it. Afterwards the Garner Fire Department burnt what was left of the house for practice.

A. F. Patton before leaving the house the morning of the fire turned off the electric hot water heater in the house by disconnecting at the fuse box the two wires leading to this heater. The hot water heater, which was in the bathroom, had rested on a deck. After the fire, the hot water heater had fallen down into the hole burned in the bathroom floor, and the deck on which it was built was burned so that it had fallen down. "The fiber glass in the jacket of the hot water heater was melted but not all of the fiber glass was burned. You could see some of the fiber glass insulation around the bottom of the heater and the bare metal at the top of the water heater."

It is well settled law in this jurisdiction that the fact in controversy here, as to the origin of the fire, may be established by circumstantial evidence. *Drum v. Bisaner,* 252 N.C. 305, 113 S.E. 2d 560; *Lawrence v. Power Co.,* 190 N.C. 664, 130 S.E. 735; *Moore v. R. R.,* 173 N.C. 311, 92 S.E. 1; *Ashford v. Pittman,* 160 N.C. 45, 75 S.E. 943.

Plaintiffs' evidence, if believed by the jury, is sufficient to establish the following facts:

One. The fire, which burned plaintiffs' house, originated under the house directly beneath the bathroom floor, and burned a hole about 3½ feet in diameter through the bathroom floor. No other hole was burned through the floor anywhere else in the house.

Two. When the fire burned through the bathroom floor, it broke loose inside the house.

Three. Beneath the burned hole in the bathroom floor was a leaking piece of copper pipe the defendant had replaced on the afternoon of the fire.

Four. Bennett Rowland, who as a tenant moved his furniture inside the house the day of the fire, locked up the house and left about 2:30 p. m. o'clock on that day. Before he left, he went into all the rooms of the house to see if there was any evidence of fire or smoke, and found none.

Five. Defendant, a plumber, by contract with plaintiffs the afternoon of the fire repaired a leak in the water pipes of the house directly beneath the burned hole in the bathroom floor by using a sweat joint. He told A. F. Patton "he had sweated pipe at one end at the truck before he went under the house and made the last connection under the house."

Six. "Sweat that joint means, that is used by a flame torch that you heat this pipe and adapter to a temperature and place your solder on it and it runs in and runs around the joint." Both ends of the pipe fixed by defendant were attached that way.

Seven. Defendant uses in his work butane gas torches, which have open flames when in operation.

Eight. Between 4:30 and 5:30 p. m. o'clock on the afternoon of the fire defendant told Harriet Patton by telephone that he had completed this work. About 6:00 or 6:30 p. m. o'clock this same afternoon Emmett Bagwell driving in a car along a road approximately 50 yards from the house saw a fire underneath the house.

Only one other fact is necessary to be established in order to sustain plaintiffs' allegations as to the origin of the fire, to wit, that defendant repaired the leaking water pipe by a sweat joint using for such purpose an open flame gas torch in a negligent and careless manner, so that the wood under the bathroom floor or its sills were set afire, which he did not extinguish before he left, or that he failed to take reasonable precautions and care to see that no flames or smouldering wood were present before he removed himself from beneath the house. In our opinion, the facts and circumstances shown by plaintiffs' evidence would permit, but not compel, a jury fairly and reasonably to infer this fact. In finding said fact the jury would not be left to mere speculation and conjecture.

In *Frazier v. Gas Co.*, 247 N.C. 256, 100 S.E. 2d 501, this Court said: " ' . . . Direct evidence of negligence is not required, but the same may be inferred from acts and attendant circumstances, and . . . if the facts proved establish the more reasonable probability that the defendant has been guilty of actionable negligence, the case cannot be withdrawn from the jury, though the possibility of accident may arise on the evidence.' *Fitzgerald v. R. R.*, 141 N.C. 530, 54 S.E. 391; *Peterson v. Tidewater Power Co.*, 183 N.C. 243, 111 S.

E. 8. 'The plaintiff is not bound to prove more than enough to raise a fair presumption of negligence on the part of the defendant and of resulting injury to himself.' *Henderson v. R. R.*, 159 N.C. 581, 75 S.E. 1092."

Plaintiffs' evidence, in our opinion, is strong enough in probative force to require the submission of the issues to the jury. The judgment of compulsory nonsuit entered below is

Reversed.