MARY H. PRIDGEN, ADMINISTRATRIX OF THE ESTATE OF JOHN JACOB PRIDGEN, DECEASED v. T. R. UZZELL, ADMINISTRATOR OF THE ESTATE OF CLARENCE HAYWOOD SPEIGHT, DECEASED.

(Filed 22 March, 1961.)

1. **Automobiles § 41p—**

It is not required that the identity of the driver of an automobile at the time of an accident be established by direct evidence but such identity may be established by circumstantial evidence, either alone or in combination with direct evidence.

2. **Trial § 22a—**

On motion to nonsuit, the evidence is to be considered in the light most favorable to plaintiff, giving plaintiff the benefit of every reasonable inference therefrom.

3. **Automobiles § 41p— Circumstantial evidence of identity of driver of car held sufficient to be submitted to the jury.**

Evidence tending to show that for some three weeks prior to the accident in suit defendant's intestate had the automobile in question in his possession, that he was seen to drive it almost daily, that no one else was seen to drive the vehicle, that on the morning in question defendant's intestate drove the vehicle to a store and had gasoline put into it, that several minutes later he drove the vehicle away with plaintiff's intes-

tate riding as a passenger, and that some twenty or twenty-five minutes later the car overturned as a result of recklessness, demolishing the car and fatally injuring both occupants, *is held* sufficient, together with evidence of other facts and circumstances, to permit a reasonable and legitimate inference that defendant's intestate was operating the car at the time, and nonsuit was erroneously entered.

APPEAL by plaintiff from *Hooks, S.J.*, September-October 1960 Civil Term of WILSON.

Civil action to recover damages for personal injuries, pain and suffering prior to death, for medical expenses, and for the alleged wrongful death of plaintiff's intestate.

This is a summary of plaintiff's evidence:

About three months prior to 12 May 1958 Clarence Haywood Speight began living in a house about 300 yards behind Carris Lucas' store at Lamm's Crossroads. For about three weeks before 12 May 1958 Speight had in his possession a 1952 two-tone blue Chevrolet automobile. Carris Lucas, who lives at Lamm's Crossroads and operates a store there, saw Speight operate this automobile about every day. He never saw anyone else operate it.

About 8:20 o'clock a.m. on 12 May 1958 Speight drove the automobile up to Carris Lucas' store from the direction of the city of Wilson, and stopped. A man, whom Lucas did not know, was riding in the automobile on the front right side. Lucas put ten gallons of gas in the automobile for Speight. In three or four minutes Speight drove the automobile away, turning to the right on the paved road leading toward Horne's Church down by Lamm's School. The man was in the automobile, when Speight drove away.

On the morning of 12 May 1958 Sidney Godwin and Kinzey Allen, Jr., were working in a field on the north side of the road leading to Lamm's Crossroads. Allen heard a heavy roaring, and saw an automobile travelling at a very fast speed enter a curve in the road. Then a house right in the curve blocked his view, but he could see the back end of the automobile after it turned over. Godwin heard Allen say "he is turned over." Both started to the road. Allen reached there first, and called to Godwin, "he is not dead, get an ambulance, and get him to the doctor." Godwin did not go all the way, but before leaving to call an ambulance saw a body lying on the south side of the road, and a man in the automobile, and it looked to him like his feet were hanging out through the windshield.

C. E. Bottoms was working in a tobacco patch about 100 yards from the road. He went to the scene. Allen was there, Godwin had gone to call the Highway Patrol. He saw John Jacob Pridgen, plaintiff's intestate, lying with his back down in the automobile between the steering

wheel and the door and his legs up to his knees hanging out of the place where the windshield had been, and a man's body lying out in a corn field. There was glass all in the road. The automobile was lying across the road on its left side. He saw about 15 or 20 feet from the automobile a pile of brains about the size of a terrapin shell lying on the paved road. He went and looked at the body in the field. It was the body of defendant's intestate Speight, was lying face down, and it looked as if the whole back of his head was gone.

C. J. Cole, a State highway patrolman, according to his direct examination, arrived at the scene at 8:45 o'clock a.m., and saw a 1952 Chevrolet automobile overturned on the road, "which connects Lamm's Crossroads with Horne's Church." Cole testified on redirect examination that he was notified at 8:45 o'clock a.m., and arrived at the scene at 9:00 o'clock a.m. He saw the dead body of Speight lying in a field. Pridgen was not there. The weather was fair. The road was dry. The pavement on the road was twenty feet wide, and it had on each side shoulders three feet wide. The automobile was lying on its left side on the left side of the road facing Lamm's Crossroads, partially on the left side of the pavement and partially on the shoulder. Its top was mashed in, its left side was damaged and bent in, most of the automobile had some bent in or dented places on it, the windshield had been separated from it, and was lying broken on the road.

Plaintiff offered in evidence for the purpose of illustrating the testimony of the witnesses, what is called in the record a diagram and marked Exhibit 6, which diagram is before us. Exhibit 6 is an actual survey by Lewis L. Ellis, a registered land surveyor, of the curve where the Chevrolet automobile overturned showing also adjacent land. Cole used this survey extensively to illustrate his testimony. This survey shows that it is 1.9 miles from the overturned automobile to Lamm's Crossroads.

Cole testified in substance: There were tire markings on the pavement beginning at the rear of the overturned automobile, and these markings continued on the south side of the paved road towards the shoulder 59 feet by his measurement. There were further marks, partially on the pavement and partially in the ditch extending in a westerly direction 69 feet. There were further marks westerly on the pavement at an angle in a northwesterly direction for 52 feet, continuing to the edge of the pavement, where it connects with the shoulder. There were further marks continuing in a north or northwestern direction continuing down the shoulder and ditch on the north side of the pavement in a westerly direction for 132 feet: these markings were partially on the pavement and partially in the ditch. These markings were not

continuous: they had gaps in them. The markings on the pavement had rubber. There was no sign of rubber on the dirt shoulders. These markings or marks appeared to be fresh. Cole saw a spot of blood in about the center of the right-hand traffic lane of the paved road going east from Horne's Church to Lamm's Crossroads, which he marked with the letter F on Exhibit 6. He saw a second spot of blood near the center line of the road, which he marked with the letter G on Exhibit 6. In addition to the blood at these points, which appear to be only a few feet apart as shown on Exhibit 6, he saw brains mixed with blood and hair. The body of Speight was in a field 148 feet from the second spot of blood and brains and hair he saw on the paved road, and 20 feet from the pavement where the overturned automobile was lying.

Pridgen was carried to the Carolina General Hospital. He had a broken neck, head injuries, and other injuries. He was confused. He had the odor of alcohol on his breath. Two holes were bored in his head, Crutchfield Tongs were inserted therein, and his head was put in traction with a certain amount of weight as treatment for his broken neck. On 3 July 1958 he became a patient at the Veterans Administration Hospital at Durham, where he died on 24 July 1958. Dr. Horace B. Cupp, Jr., found by the court to be a medical expert witness in the field of neurological surgery, who saw Pridgen in the Veterans Administration Hospital and diagnosed his condition, testified: "My clinical impression is that he (Pridgen) died from shock secondary to overwhelming infection. Approximately 25% of the entire bone covering of the brain was removed from Mr. Pridgen's skull after the performance of these two operations." He had testified earlier: "It was my opinion that the infection resulted from the presence of the traction in the skull."

From a judgment of involuntary nonsuit entered at the close of plaintiff's evidence, plaintiff appeals.

*Lamb, Lamb & Daughtridge and Finch and Narron for plaintiff, appellant.*

*Gardner, Connor & Lee for defendant, appellee.*

PARKER, J. Plaintiff has plenary evidence tending to show that the driver of the overturned Chevrolet automobile was guilty of actionable negligence in operating it carelessly and heedlessly in violation of G.S. 20-140, and in driving it at a very fast rate of speed when approaching and going around a curve in violation of G.S. 20-141(c).

The primary question presented for decision is whether plaintiff

has sufficient evidence to carry her case to the jury that defendant's intestate Speight was driving the automobile when it overturned.

What is said in *Bridges v. Graham,* 246 N.C. 371, 98 S.E. 2d 492, is applicable here: "Plaintiff did not offer any direct evidence showing that William Graham was driving the automobile at the time it overturned. She was not required to do so. Circumstantial evidence, either alone or in combination with direct evidence, is sufficient to establish this crucial fact."

Plaintiff's evidence tends to show the following facts: For about three weeks before the Chevrolet automobile overturned Clarence Haywood Speight had had it in his possession, and during this time he drove it nearly every day. During this period Speight lived in a house behind Carris Lucas' store at Lamm's Crossroads, and Carris Lucas saw no one else drive it. About 8:20 o'clock a.m. on 12 May 1958 Speight drove this automobile up to Carris Lucas' store. A man, whom Lucas did not know, was in the automobile sitting on the right front side. Lucas put ten gallons of gas in the automobile, and three or four minutes later Speight drove it away turning to the right on the paved road leading towards Horne's Church. The man was in the automobile with him, when it left. In about twenty or twenty-five minutes after Speight drove this automobile away from Carris Lucas' store, it overturned on the road leading from Lamm's Crossroads to Horne's Church. After the automobile had overturned and come to rest lying on its left side on the left side of the road facing Lamm's Crossroads, partially on the left side of the pavement and partially on the shoulder, Speight's dead body was lying face down in a cornfield, and it looked as if the whole back of his head was gone. Two spots of blood near together mixed with blood and hair were on the paved road twenty feet from the overturned automobile, and 148 feet from Speight's dead body in the cornfield. After the automobile had overturned and come to rest, plaintiff's intestate, John Jacob Pridgen, was living, and was lying with his back down in the automobile between the steering wheel and the door and with his legs up to his knees hanging out of the place where the windshield had been. The top of the automobile was mashed in, its left side was damaged and bent in, most of it had some bent in or dented places on it, the windshield was out of it, and was lying broken in the road.

Taking plaintiff's evidence as true, and considering it in the light most favorable to her, and giving her the benefit of every reasonable inference to be drawn therefrom, as we are required to do in passing on a motion for judgment of involuntary nonsuit (*Watters v. Parrish,* 252 N.C. 787, 115 S.E. 2d 1; *Polansky v. Insurance Ass'n.,* 238 N.C. 427, 78 S.E. 2d 213), it is our opinion, and we so hold, plaintiff has

sufficient evidence to permit, but not to compel, a jury to make a reasonable and legitimate inference from the facts shown by her evidence that Clarence Haywood Speight was driving the automobile at the time it overturned, resulting in his death, and in injuries to plaintiff's intestate, which her evidence tends to show resulted in his death. In our opinion, plaintiff has offered sufficient evidence to take the question as to the driver of the automobile at the time it overturned out of the realm of conjecture and into the field of legitimate inference from established facts.

The facts in this case have many similarities to the facts in *Bridges v. Graham, supra,* which we held was a case for the jury.

The facts in *Parker v. Wilson,* 247 N.C. 47, 100 S.E. 2d 258, are easily distinguishable.

The judgment of involuntary nonsuit below is

Reversed.