## R. D. JENKINS v. LEFTWICH ELECTRIC COMPANY.

(Filed 3 May, 1961.)

**1. Appeal and Error § 41—**

The burden is upon appellant not only to show error but also that the alleged error was prejudicial.

**2. Negligence § 7—**

Negligence must be the proximate cause of injury or damage in order to constitute the basis for a cause of action.

**3. Electricity § 4—**

The rule that the highest degree of care commensurate with the practical operation of the business must be exercised by those who manufacture and distribute electrical current applies also to those who install electric wiring and equipment, and the rule is applicable not only in actions to recover for death or injury to persons but also to actions to recover for damage to property.

**4. Electricity § 1—**

The National Electrical Code, as approved by the American Standards Association on 5 August 1959, and filed in the office of the Secretary of the State of North Carolina, has the force and effect of law in this State. G.S. 143-138.

**5. Trial § 22—**

On motion to nonsuit, plaintiff's evidence must be taken as true and considered in the light most favorable to him, giving him the benefit of every reasonable inference to be drawn therefrom, and defendant's evidence which is favorable to plaintiff or which tends to clarify and explain plaintiff's evidence must also be considered, but defendant's evidence which is in conflict with that of plaintiff or which tends to contradict or impeach plaintiff's evidence is not to be considered.

**6. Negligence § 7—**

Proximate cause is that cause which produces the result in continuous sequence and without which it would not have occurred, and one from which any man of ordinary prudence could have foreseen that such a result was probable under all of the facts then existing.

**7. Negligence § 24a—**

The existence of negligence and proximate cause may be proved by circumstantial evidence which establishes these factors as a more reasonable probability and not as a mere possibility or conjecture.

**8. Electricity § 7— Questions of negligence and proximate cause held for jury in this action to recover for fire from defective wiring.**

Evidence tending to show that defendant installed electrical wiring, switch boxes, junction boxes, and receptacles in defendant's home pursuant to contract, that one of the workers was inexperienced, that wires in a switch box installed behind the refrigerator in the kitchen were installed in violation of the National Electrical Code, that immediately after the

electricity to the house was turned on the lights in one room showed only a dark red glow while the lights in another room burned excessively bright and exploded after three or four minutes, and that within two hours thereafter fire broke out, which originated in the area of the kitchen, *is held* sufficient to be submitted to the jury upon the question of negligence in the installation of the wiring, and whether such negligence was the proximate cause of the fire and consequent damage.

APPEAL by defendant from *Pless, J.,* January 1961 Term of CALDWELL.

Civil action to recover damages for the destruction by fire of plaintiff's new home and of his household and kitchen furniture and other personal property therein allegedly caused by the negligent installation of electric wiring, switch boxes, junction boxes and receptacles in his home by defendant.

The following issues were submitted to the jury, and answered as appears.

"1. Was plaintiff damaged in his property as a result of the negligence of the defendant as alleged?

"Answer — Yes.

"2. What amount, if any, is plaintiff entitled to recover of this defendant?

"Answer — $4200.00."

From a judgment entered in accord with the verdict, defendant appeals.

*Townsend and Todd By: James R. Todd, Jr., for plaintiff, appellee.*
*L. H. Wall and Hal B. Adams for defendant, appellant.*

PARKER, J.  Plaintiff's evidence tends to show the following facts: In the autumn of 1959 plaintiff was the owner of a new home, which he had recently constructed. It had a fair market value of $4,500.00. He had in it household and kitchen furniture and other articles of personal property with a fair market value of $5,125.00. He had fire insurance on his home in the amount of $3,000.00, and no insurance on his personal property therein. In November 1959 he had moved in this home.

Defendant Electric Company contracted with plaintiff to install the electric wiring, switch boxes, junction boxes and receptacles in his home for a price of $130.00. Defendant sent Sanford Bowers, who had been an electrician for a number of years, and a helper Clyde Craig, known as Pete, to do the work. Pete Craig wired the refrigerator receptacle in the kitchen, and all the wiring and installing in

the kitchen. Pete Craig asked Bowers did the black wire go with the black, and the red with the red. Bowers replied they did. Pete put on the meter box upside down, and Bowers called his attention to it, and changed it. On 9 November 1959 Bowers told plaintiff he was through with the work, he would have the work inspected, and the Duke Power Company would turn on the electricity.

On 10 November 1959 plaintiff was in his home, and the Duke Power Company turned on the electricity between 4:00 or 5:00 o'clock p.m. Within 30 or 40 minutes thereafter he turned on the lights in his living room. He had an upright lamp there with two 100-watt bulbs in it, and the lights showed only a dark red glow. He went in the kitchen, and switched on the overhead light fixture which had two 100-watt bulbs in it. These bulbs came on tremendously bright, and after three or four minutes exploded, and the lights went out. When these bulbs exploded, the refrigerator stopped. The refrigerator was in the kitchen, and back of it was a receptacle in which the refrigerator connection was inserted. He cooked his supper on the electric range, and left his home about 6:45 o'clock p.m.

D. W. Gragg, who lived about 500 yards from plaintiff's home, came out of his house, and saw the windows in plaintiff's house, and they looked a light blue color. He saw flames break through "on the eve of the house on the upper side, right where the kitchen was." He went to his telephone to call Archie Davis' service station because plaintiff went there occasionally in the evenings, but the telephone was busy. He got in his truck to go to Archie Davis' service station, and met plaintiff on the way. Davis told him plaintiff had received the news, and he went to the fire. He saw plaintiff there upon arrival.

About one hour after plaintiff left his home, he received the news that his home was on fire by telephone at Archie Davis' service station. He left for his home, and when he reached there flames were all over the interior. "I could tell that the kitchen had fallen in, and it appeared that the fire originated in that area. I am certain that I switched the electric range off at the time I left home, because I checked the range twice." His home and its contents were destroyed by the fire.

The next morning Jack Huffman, general manager for City Electric Company of Hickory, one of the largest contractors there, at plaintiff's request went with him to the scene of the fire. Huffman is familiar with all types of wiring, switches, junction boxes, etc. He supervises the installation for his company. He is familiar with the National Electrical Code. The court, without objection by defendant, held that he was an expert witness as an electrician. When Huffman

with plaintiff reached the scene, he saw nothing much, only ashes; a few boards may have been standing; it was still smoking. While digging around through the ashes with his hands he found a switch box, which plaintiff said was where it was behind his refrigerator. In the electric business a switch box is used for all switches, outlets, or receptacles. This switch box fitted in the classification of switch boxes 2 inches by 1 3/4 inches by 2 3/4 inches in Table 370-6 (a-1) of the National Electrical Code. This table specifies how many wires should be put in a box depending on its size, and this is set out for the protection of property owners. This switch box had 8 wires in it, twice as many as the maximum permitted by the National Electrical Code. (It would seem from the record that the wires were number 12-2). This was a violation of the National Electrical Code. The wires in the switch box were clamped awfully tight. The metal of the clamp could cut into the copper of the wires, and cause a short circuit, which would blow a fuse. Huffman testified, "even if there had been the number of wires in the box allowed in the Code, in the manner they were clamped, it was done in a manner which was not safe. They were too tight." The negative and hot wires were not placed in the switch box in the ordinary and customary way of wiring. In Huffman's opinion, it was possible that the wiring in the installation as he found it could have caused 220 volts to go into the appliance. It was also his opinion that the installation as he found it could have caused a leaking circuit, not enough to show on a bell ringing circuit, or a test set, and not enough to blow a fuse. When the refrigerator was plugged in it, it could have started the heating, but he would not say it did. Huffman testified without objection: "The place where I found this receptacle, which was behind the refrigerator, in the kitchen, the floor had been burned through at those locations, in front and behind the refrigerator and in looking through the remains, there is where I found that receptacle."

On recross-examination Mr. L. H. Wall, one of defendant's counsel, asked Huffman if he had signed a written statement. Huffman replied Yes. Whereupon Mr. Wall read the statement, and asked that it be marked for identification as defendant's Exhibit A, which statement is as follows:

"I, Jack Norman Huffman, age 31, reside at Conover, N. C. I am manager of the City Electric Company in Hickory, N. C.

"On 11-11-59 I was called by R. D. Jenkins to Collettsville Road, Lenoir, N. C. He told me his new home had burned down and he wanted me to come over and see if I could find any fault in the wiring that was left after the fire. I went over that day,

and the only thing I could find in the ruins that would indicate a violation of the National Electric Code was a receptacle that had nine wires connected to it, and this was too much wiring for the size of the receptacle and is against regulations of the National Electric Code. Also the clamps that hold the wires together in the rear of the box were so tight that possibly the insulation on the wiring could have been broken and this would have caused heat, but not enough to blow a fuse. This is not actually faulty wiring, that is, having nine wires connected to one receptacle, but it is a violation of the National Code. Other than this I could find nothing that would indicate faulty wiring, or violation of the National Electric Code."

On cross-examination Jack Huffman testified: "I found two ground wires in the receptacle and three neutral wires. Neither the neutral or ground wires are conductors."

Immediately thereafter he testified on redirect-examination: "There are a total of 8 wires through the box. And there was a total of 8 wires there at the time I found it. I told Mr. Jenkins it was a violation of the Code."

When plaintiff rested his case, defendant introduced evidence as follows:

Sanford Bowers testified in substance: He is an employee of defendant. He and a helper, Clyde Craig, did for defendant the wiring of plaintiff's home. He is, to a certain extent, familiar with the National Electrical Code, and he installed the wires in accordance with that Code, as he understood it. On cross-examination he was shown the switch box which Jack Huffman found in the ashes of plaintiff's home, and was asked whether it was in compliance with the National Electrical Code. He replied, "No, sir; I don't think it is."

T. W. Younts is the county and city wiring inspector. He is familiar with the National Electrical Code. He inspected the wiring in plaintiff's home on 9 November 1959, and made out a certificate. He went to the scene after the fire. Jack Huffman and plaintiff were there. He went over with Huffman the portions of the receptacles that had been found there and introduced in evidence, to see how they had been wired. He found one violation of the National Electrical Code. "There was one too many wires in the box." He could not tell anything about the clamp in the box having been too tight: the insulation was gone, and there was no way for him to tell. He testified on cross-examination: "There is a violation of the Code because there were 2 cables under one clamp. . . . There were 6 wires in the box. The Code limitation is 4 No. 12 wire. There are not 4 wires too many."

He testified further on cross-examination in substance as follows: Looking at the clamp and the manner it is placed over the wires, it is possible it could have cut through a portion of the insulation on one or more of the wires. If the insulation were cut through, actually, that would be a short circuit. It is possible a partial short circuit will not necessarily blow a fuse. It is possible for such a condition to generate heat as an act of ground leakage. When he made his inspection he did not inspect this particular installation and check it. He testified on redirect-examination: "If there is a short circuit your fuse is going to kick out, and that circuit is dead."

Ned Leftwich, secretary and treasurer of defendant, has been doing electrical work for 20 years. One cannot tighten a clamp tight enough to damage the wires. He testified on cross-examination: "There are more wires in the box than we normally put in one."

E. L. Leftwich, president of defendant, is a licensed electrician. He testified on direct-examination:

> "I have examined the box (Plaintiff's Exhibit 'A') and find three neutral wires, and three conductors. Your neutral wire is a conductor, but where they come into a box and tap out they are counted as one terminal, one conductor. The Code does not say anything about wires. They say conductors. So there are six conductors in this box and three of them are tapped out and count as one. Tapped out means just tapped out to an appliance. My interpretation of the Code is that where a wire comes into a box and goes on to an appliance of some kind that the wire that comes in and the one that goes out are counted as one. Based upon this interpretation of the Code there are four conductors in the box."

He testified on cross-examination:

> "I do not think the installation was a violation of the Code even if Mr. Huffman and Mr. Younts so stated. There were more wires in the box than we usually put in, there were more than I would have put in, but it absolutely is not against the Code. The reason I only put two wires in a receptacle is that I never do nothing but feed into it and if I am feeding another receptacle I will feed that out, and that takes just two wires. That for me is the generally accepted practice but I have seen twice as many wires in a box as was supposed to have been in this one."

Defendant introduced in evidence Jack Huffman's written statement which it read, and had marked for identification.

Defendant has ten assignments of error to the overruling of its

objections to questions asked the witness Jack Huffman. It has favored us with no citation of authority at all in respect to these ten assignments of error. If there was error in the admission of Huffman's testimony over defendant's objections, which we do not concede, it seems to have been cured in large part by defendant's introducing in evidence the written statement of Huffman. Suffice it to say that prejudicial error in respect to these ten assignments of error has not been shown, and all are overruled.

The assignment of error to the testimony of D. W. Gragg is clearly without merit.

There is no assignment of error to the charge of the court. Defendant's principal contention is that the court erred in failing to allow its motion for judgment of involuntary nonsuit made at the close of all the evidence. Its chief argument is that even if there is some evidence of a slight deviation from the National Electrical Code in the installation of the electric wiring and switch box by it, there is no evidence that this deviation was a proximate cause of the fire that destroyed plaintiff's home and its contents.

"It is a fundamental principle that the only negligence of legal importance is negligence which proximately causes or contributes to the injury under judicial investigation." *McNair v. Richardson*, 244 N.C. 65, 92 S.E. 2d 459.

The duty and care to be exercised by electric companies generating and selling electricity is clearly set forth in *Kiser v. Power Co.*, 216 N.C. 698, 6 S.E. 2d 713: "A high degree of foresight is required of the defendant because of the character and behavior of electricity which it generates and sells. *Shaw v. Public-Service Corp.*, 168 N.C., 611, 84 S.E. 1010. The defendant's knowledge of its service is supposedly superior to that of its customer's. It is not unreasonable, therefore, in view of the dangerous character of the product, to require the 'utmost diligence and foresight in the construction, maintenance, and inspection of its plant, wires, and appliances, consistent with the practical operation of the business.' *Turner v. Power Co.*, 167 N.C., 630, 83 S.E., 744. The care required must be commensurate with the dangers incident to the business. And so the law is written. *Haynes v. Gas Co.*, 114 N.C., 203, 19 S.E., 344.'"

In *Small v. Utilities Co.*, 200 N.C. 719, 158 S.E. 385, is set forth some of the various expressions found in the decisions in respect to the degree of care required by electric companies in such cases, and then the Court says: "In approving these formulae as to the degree of care required in such cases, it is not to be supposed that there is a varying standard of duty by which responsibility for negligence is to be determined. *Helms v. Power Co.*, supra. The standard is always

the rule of the prudent man, or the care which a prudent man ought to use under like circumstances. What reasonable care is, of course, varies in different cases and in the presence of different conditions. *Fitzgerald v. R.R.*, 141 N.C., 530, 54 S.E., 391. The standard is due care, and due care means commensurate care under the circumstances. *Hanes v. Shapiro*, 168 N.C., 24, 84 S.E., 33; 9 R.C.L., 1200." It seems from reading the decisions that the rule was adopted primarily for the protection of human life, but the fact that property alone is injured or destroyed does not abrogate the rule.

In *Conn v. Lexington Utilities Co.*, 233 Ky. 230, 25 S.W. 2d 370, the ultimate problem presented by the appeal was to determine the degree of care owed by a contractor who installs electric wires in a dwelling house. What the Court said in this case seems to us to be sound law: "One who installs an instrumentality for a known use, which involves a great danger to life and limb, must exercise a degree of care commensurate with the danger for the protection of those who rightfully may be subject to the peril. The duty rests upon those who make and distribute the dangerous current, and upon those who provide the appliance and facilities as well. . . . One who engages in the business of installing electric wires must be held to the same degree of care as those who make and distribute the current, because the danger to be guarded against is the same. Electricity is not only dangerous, even deadly, but it is invisible, noiseless, and odorless, rendering it impossible to detect the presence of the peril until the fatal work is finished. It is for this reason that the high duty is imposed, and being imposed, a breach of it fixes liability for the resulting injury to those to whom the duty is owed. The duty is not different because the injury from its violation happens to property instead of to persons. It follows from the consideration suggested, and the authorities adduced, that those who install wires for the carriage of dangerous currents of electricity are under the same duty respecting it as those who manufacture and distribute that current."

This is said in 18 Am. Jur., Electricity, § 49, p. 446: "AS TO INSTALLING ELECTRICAL EQUIPMENT — One engaged in the business of generating and distributing electricity and who sells and engages to install electric equipment and supply current therefor must exercise the care of a reasonably prudent man skilled in the practice and art of installing such equipment, according to the state of the art or method generally used by persons engaged in a like business at the time the work is done."

Plaintiff has based his case squarely upon the alleged negligence of defendant in the installation of electric wiring, switch boxes, junction boxes, and receptacles in his home, in that in making the in-

stallation defendant did not exercise commensurate care with the danger under the circumstances in respect to bringing currents of electricity into his home, and in that defendant in making such installation violated the National Electrical Code, which was a part of the North Carolina State Building Code in effect at the time of the fire, and is now in effect. The case was tried upon that theory.

North Carolina has been a pioneer in the field of statewide building and fire prevention regulations which have been enacted for the protection of the public. The Building Laws passed in 1905 — Public Laws 1905, Chapter 506 — and earlier and later Acts codified in C.S., 1919, Vol. I, Municipal Corporations, Article 11, provided regulations for materials and methods of construction in use at that time.

A meeting was held in Raleigh on 28 November 1931 at North Carolina State College to discuss the formulation of a modern State Building Code. The General Assembly of 1933, Public Laws 1933, Chapter 392, created a Building Code Council and authorized it to, in co-operation with the Commissioner of Insurance, prepare and adopt a Building Code. The first North Carolina Building Code received the approval of the Official Building Code Council and the Commissioner of Insurance in 1935, and was printed the same year. This was known as the 1936 Edition.

The North Carolina Building Code adopted, promulgated and published in 1936 was ratified and adopted by Chapter 280, Public Laws of North Carolina 1941, by clear and specific reference, and that Act provides that such provisions "shall continue in full force and effect unless and until they may be modified as hereinafter authorized." "The National Electrical Code referred to in the North Carolina Building Code published in 1936, by virtue of the Act of 1941, has the force and effect of law." *Lutz Industries, Inc. v. Dixie Home Stores,* 242 N.C. 332, 88 S.E. 2d 333.

A few modifications of this 1936 Building Code were made from time to time by the Building Code Council, and accepted by the Commissioner of Insurance. A general revision to bring this Code up to date was considered in order at a meeting by the Building Code Council on 12 November 1952, attended by representatives from several State organizations interested in the construction industry. At the suggestion of the Chairman of the Building Code Council, a preliminary draft was prepared by the staff of the Department of Insurance, and copies were mailed to various organizations interested in the construction industry. Comments and criticisms were received from several of these organizations and open meetings were held in the office of the Commissioner of Insurance together with represent-

atives of these organizations. By a unanimous vote on 19 June 1953, the Building Code Council adopted the draft as revised and recommended its acceptance by the Commissioner of Insurance. On the same date the Commissioner of Insurance accepted the recommendations of the Council, and ordered the final draft printed. In respect to the history of our building and fire prevention regulations above stated, see foreword to North Carolina State Building Code, 1958 Edition.

This is said in *Drum v. Bisaner*, 252 N.C. 305, 113 S.E. 2d 560, which was an action to recover damages resulting from a fire allegedly caused by defendant's negligence in installing a fan over the roof of the kitchen of plaintiff's restaurant: "The North Carolina Building Code of 1953, Article XVI, in pertinent part, provides: 'Except as may be otherwise provided by rules promulgated by the Building Code Council, the electrical systems of a building or structure shall be installed in conformity with the "National Electrical Code," as approved by the American Standards Association and as filed in the office of the Secretary of State. The electric wiring of houses or buildings for lighting or for other purposes shall conform to the regulations prescribed by the organization known as National Board of Fire Underwriters.' "

The 1957 General Assembly in Chapter 1138, 1957 Session Laws, rewrote the 1933 Act, and reorganized and expanded the Building Code Council. This Act became effective 1 July 1957. This Act is codified in G.S., Vol. 3B, Chapter 143, Article 9, Building Code Council and Building Code, Sections 143-136-143-143, both inclusive.

G.S. 143-138(a) empowered the Building Code Council to prepare and adopt a North Carolina State Building Code. G.S. 143-138(b) provides in pertinent part: "The North Carolina State Building Code, as adopted by the Building Code Council may include . . . regulations governing . . . electrical systems (regulations for which electric systems may be the National Electric Code, as approved by the American Standards Association and filed with the Secretary of State); and such other reasonable rules and regulations pertaining to the construction of buildings and the installation of particular facilities therein as may be found reasonably necessary for the protection of the occupants of the building, its neighbors, and members of the public at large." G.S. 143-138(c) sets forth in detail the standards to be followed in adopting the North Carolina State Building Code, and provides in relevant parts: "All regulations contained in the North Carolina State Building Code shall have a reasonable and substantial connection with the public health, safety, morals, or general welfare, and their provisions shall be construed liberally to those ends. Re-

quirements of the Code shall conform to good engineering practice, as evidenced generally by the requirements of . . . the National Electric Code, . . . . , and similar national agencies engaged in research concerning strength of materials, safe design, and other factors bearing upon health and safety." G.S. 143-138(f) provides: "Until such time as the North Carolina State Building Code has been legally adopted by the Building Code Council pursuant to this article, the North Carolina Building Code adopted by the Council and the Commissioner of Insurance in 1953 shall remain in full force and effect. Such Code is hereby ratified and adopted." G.S. 143-138(h) provides that "any person who shall be adjudged to have violated this article or the North Carolina State Building Code shall be guilty of a misdemeanor. . . ."

The 1958 Edition of the North Carolina State Building Code is a reprint of the 1953 Edition together with all amendments to date. The North Carolina State Building Code, 1958 Edition, in Article XVI, page 216, in pertinent part, provides: "ELECTRICAL INSTALLATIONS. Except as may be otherwise provided by rules promulgated by the Building Code Council, the electrical systems of a building or structure shall be installed in conformity with the 'National Electrical Code,' as approved by the American Standards Association and as filed in the office of Secretary of State. The electric wiring of houses or buildings for lighting or for other purposes shall conform to the regulations prescribed by the organization known as National Board of Fire Underwriters."

Therefore, on 10 November 1959, the date of the fire here, the National Electrical Code, as approved by the American Standards Association on 5 August 1959, and which Code is filed in the office of the Secretary of State of North Carolina, by virtue of G.S. 143-138, had the force and effect of law in North Carolina. *Lutz Industries, Inc. v. Dixie Home Stores, supra; In re O'Neal,* 243 N.C. 714, 92 S.E. 2d 189; *Drum v. Bisaner, supra.*

The 1959 National Electrical Code — Standard of the National Board of Fire Underwriters for Electric Wiring and Apparatus as recommended by the National Fire Protection Association — American Standard Approved 5 August 1959 by American Standards Association, and on file in the office of the Secretary of State, provides on page 149: "370-6. Number of Conductors in a Box. Boxes shall be of sufficient size to provide free space for all conductors enclosed in the box." On the same page, 370-6(a) "The maximum number of conductors, not counting fixture wires, permitted in outlet and junction boxes shall be as in Tables 370-6 (a-1 and -2) with the exceptions noted." Table 370-6(a-2) applies to shallow boxes of less than 1½

inches depth. The maximum number of conductors Number 12 for a box with dimensions 2 inches by 1 3/4 inches by 2 3/4 inches is 4, as set forth in Table 370-6(a-1). Then 370-6 provides in relevant part on page 150: "Tables 370-6 (a-1 and-2) apply where no fittings or devices, such as fixture studs, cable clamps, hickeys, switches or receptacles are contained in the box. Where one or more fixture studs, cable clamps, or hickeys are contained in the box, the number of conductors shall be one less than shown in the Tables. . . . A conductor running through the box is counted as one conductor and each conductor originating outside the box and terminating inside the box is counted as one conductor. Conductors of which no part leaves the box are not to be counted in the above computation."

The term "conductor" has been construed to include only those media the purpose of which is the transmission of electricity. 29 C.J.S., Electricity, p. 475.

In passing on a motion for a judgment of involuntary nonsuit, we are required to take plaintiff's evidence as true, and to consider it in the light most favorable to him, and to give him the benefit of every reasonable inference to be drawn therefrom. *Pridgen v. Uzzell,* 254 N.C. 292, 118 S.E. 2d 755.

The law is well established in this State that in ruling upon a motion for an involuntary judgment of nonsuit, after the plaintiff and the defendant have introduced evidence, the court may consider the evidence of defendant favorable to plaintiff or which tends to clarify or explain evidence offered by plaintiff not inconsistent therewith, but it must ignore the evidence of defendant which tends to establish another and different state of facts or which tends to contradict or impeach the testimony presented by plaintiff. *Watters v. Parrish,* 252 N.C. 787, 115 S.E. 2d 1, and cases there cited. Otherwise, consideration would not be in the light most favorable to plaintiff. *Singletary v. Nixon,* 239 N.C. 634, 80 S.E. 2d 676; *Atkins v. Transportation Co.,* 224 N.C. 688, 32 S.E. 2d 209.

Plaintiff's evidence tends to show that the switch box or receptacle installed by defendant behind his refrigerator in his kitchen fitted in the classification of boxes 2 inches by 1 3/4 inches by 2 3/4 inches in Table 370-6(a-1) of the 1959 National Electrical Code, that this switch box had in it 8 wires, and that his refrigerator was connected with it. That this switch box had 8 wires in it, twice as many as the maximum permitted by the National Electrical Code.

Defendant's witness Sanford Bowers testified in substance that he and a helper, Clyde Craig, did for defendant the wiring of plaintiff's home. On cross-examination he was shown this switch box, and was asked whether it was in compliance with the National Electrical

Code. He replied, "No, Sir; I don't think it is." Defendant's witness T. W. Younts, county and city wiring inspector, testified he was familiar with the National Electrical Code. He testified on direct examination, he found one violation of the National Electrical Code. "There was one too many wires in the box." He testified on cross-examination: "There is a violation of the Code because there were 2 cables under the clamp. . . . There were 6 wires in the box. The Code limitation is 4 No. 12 wire. There are not 4 wires too many." Ned Leftwich, secretary and treasurer of the defendant, testifying for defendant said on cross-examination: "There are more wires in the box than we normally put in one."

Considering plaintiff's evidence and defendant's evidence favorable to him, there is plenary evidence to show that the switch box installed by defendant back of plaintiff's refrigerator in his kitchen had more conductors or wires in it than permitted by the National Electrical Code, and that there were 2 cables under the clamp in violation of the Code, according to defendant's witness Younts, and that these violations of this Code, authorized by G.S. 143-138, were negligence *per se. Lutz Industries, Inc., v. Dixie Home Stores, supra; Drum v. Bisaner, supra.*

Plaintiff's evidence further tends to show that the installation in plaintiff's kitchen, including this switch box, was done by defendant's employee, Clyde Craig, an incompetent worker. Defendant's evidence is that Clyde Craig was working for defendant at the time of the trial, but was not called as a witness. This use of an incompetent employee under the circumstances here for the installation of wiring, etc., for the use of electricity is negligence, because the law imposes upon every person who enters upon an active course of conduct the positive duty to exercise due care, which means commensurate care under the circumstances, and calls a violation of that duty negligence. *Council v. Dickerson's, Inc.,* 233 N.C. 472, 64 S.E. 2d 551; *Small v. Utilities Co., supra.*

We now come to the question as to whether plaintiff's evidence and the evidence of defendant favorable to him, considered in the light most favorable to plaintiff, and giving him the benefit of every reasonable and legitimate inference to be drawn therefrom, is sufficient to carry the case to the jury that defendant's negligence was a proximate cause of the fire which destroyed plaintiff's home and his personal property therein.

A proximate cause of an injury is "a cause that produced the result in continuous sequence and without which it would not have occurred, and one from which any man of ordinary prudence could

have foreseen that such a result was probable under all the facts as they existed." *Mattingly v. R. R.*, 253 N.C. 746, 117 S.E. 2d 844.

It is said in *Patton v. Dail*, 252 N.C. 425, 114 S.E. 2d 87: "It is well settled law in this jurisdiction that the fact in controversy here, as to the origin of the fire, may be established by circumstantial evidence." Citing authorities.

This Court said in *Frazier v. Gas Company*, 247 N.C. 256, 100 S.E. 2d 501: " ' . . . Direct evidence of negligence is not required, but the same may be inferred from acts and attendant circumstances, and . . . if the facts proved establish the more reasonable probability that the defendant has been guilty of actionable negligence, the case cannot be withdrawn from the jury, though the possibility of accident may arise on the evidence.' *Fitzgerald v. R. R.*, 141 N.C. 530, 54 S.E. 391; *Peterson v. Tidewater Power Co.*, 183 N.C. 243, 111 S.E. 8. 'The plaintiff is not bound to prove more than enough to raise a fair presumption of negligence on the part of the defendant and of resulting injury to himself.' *Henderson v. R. R.*, 159 N.C. 581, 75 S.E. 1092."

Plaintiff's evidence and defendant's evidence favorable to him, considered in the light most favorable to plaintiff, tends to show the following: Defendant finished the electric wiring of plaintiff's new home on 9 November 1959. The Duke Power Company turned on the electricity between 4:00 or 5:00 o'clock p.m. the next day. 30 or 40 minutes later plaintiff turned on the lights in his living room, the lights showed only a dark red glow. He then went into his kitchen and switched on the lights, which came on tremendously bright, and after three or four minutes exploded, and the lights went out. When these light bulbs exploded, his refrigerator in the kitchen stopped running. Back of this refrigerator was the switch box or receptacle, which did not comply with the requirements of the National Electrical Code, installed by an incompetent employee of defendant, and in which the refrigerator connection was inserted. He cooked his supper on the electric range, switched it off, and left his home about 6:45 o'clock p.m. Within an hour or less after he left his home, D. W. Gragg, who lived about 500 yards from his home, saw flames break through "on the eve of the house on the upper side, right where the kitchen was." Plaintiff returned to his home soon after Gragg saw the fire, and when he reached there flames were all over the interior. He testified: "I could tell that the kitchen had fallen in, and it appeared that the fire originated in that area."

Plaintiff's witness Huffman testified in substance that in his opinion the installation back of the refrigerator as he found it could have caused a leaking circuit, not enough to show on a bell ringing circuit, or a test set, and not enough to blow a fuse. When the refrigerator

was plugged in it, it could have started the heating, but he would not say it did. Huffman made a written statement, which defendant introduced in evidence. This statement, *inter alia*, contains these words: "Also the clamps that hold the wires together in the rear of the box were so tight that possibly the insulation on the wiring could have been broken, and this would have caused heat, but not enough to blow a fuse."

T. W. Younts, defendant's witness, testified in substance on cross-examination: Looking at the clamp in the receptacle and the manner it is placed over the wires, it is possible it could have cut through a portion of the insulation on one or more of the wires. If the insulation were cut through, actually, that would be a short circuit. It is possible a partial short circuit will not necessarily blow a fuse. It is possible for such a condition to generate heat as an act of ground leakage.

It seems to be a legitimate inference from the evidence that when defendant permitted an incompetent employee to install the electric wiring and receptacle in plaintiff's kitchen, it could have in the exercise of ordinary prudence foreseen that an injury from fire was probable under all the facts.

This Court said in *Henderson v. R. R.*, 159 N.C. 581, 75 S.E. 1092: If "the evidence does no more than 'raise a possibility or conjecture of a fact,' a judgment of nonsuit ought to be sustained (citing authority), but if the 'more reasonable probability' is in favor of the plaintiff's contention the question ought to be submitted to the jury. *Fitzgerald v. R. R.*, 141 N.C. 535."

After careful consideration of plaintiff's evidence and of defendant's evidence favorable to him, considered in the light most favorable to plaintiff and giving him all legitimate inferences to be drawn therefrom, it is our opinion that plaintiff was entitled to have the evidence considered by a jury to determine whether the fire was proximately caused by defendant's negligence.

In the trial below, we find

No error.