WILLIAM G. SNOW and GROVEWOOD, INC. v. DUKE POWER COMPANY

No. 113

(Filed 12 July 1979)

1. **Fires § 3; Electricity § 7— liability of power company for fire on customer's premises**

    A company supplying electricity to a customer's building is not liable for damages resulting from a fire unless plaintiff presents evidence sufficient to justify a jury in finding that the fire was proximately caused by the electricity supplied by the company to the building and that, in so supplying the electricity, the company was negligent.

2. **Fires § 3; Electricity § 7.1— fire damage—electrical origin**

   Plaintiffs' evidence was sufficient to permit the jury to find that a fire at their barn was electrical in origin where it tended to show that the fire originated at a point where the wiring connecting the weatherhead under the eaves to the meter box was "hot" with electrical current; the initially compact and concentrated nature of the flames was consistent with an electrical fire; the fire took some time to spread from the front of the barn where the "hot wires" were located to the back of the barn; and the fire was not caused by stored combustibles, an electric fence, interior wiring, stoves, electrical appliances, arson or lightning.

3. **Fires § 3; Electricity § 7.1; Negligence § 31— fire caused by electricity—power company's exclusive control of transmission lines**

   Plaintiffs' evidence was sufficient to permit the jury to find that defendant power company had exclusive control and management of the electrical current which allegedly caused plaintiffs' barn to burn where it tended to show that, with the exception of a riser wire running between the meter box and a weatherhead on the barn which was installed and owned by plaintiff barn owner, defendant owned the entire transmission system which brought power from its generators to the barn; defendant made and maintained the connections between the riser wire and the meter box and weatherhead and regularly inspected the riser wire; and defendant thus maintained exclusive control over the suitability and safety of the riser wire as a transmitter of electricity.

4. **Fires § 3; Electricity § 7.1; Negligence § 31— fire caused by electricity—res ipsa loquitur**

   In this action to recover for fire damage to plaintiffs' barn and its contents, a permissible inference of negligence by defendant power company arose under the doctrine of res ipsa loquitur and plaintiffs made out a case for the jury on the issue of defendant's negligence where plaintiffs' evidence would permit the jury to find that the fire was caused by electricity transmitted over power lines under the exclusive management and control of defendant, and that such fires do not ordinarily occur in the absence of negligence.

ON plaintiffs' petition for discretionary review of decision of the Court of Appeals, 39 N.C. App. 350, 250 S.E. 2d 99 (1979), vacating verdict and judgment in favor of plaintiffs and remanding for entry of a directed verdict in favor of defendant.

On and prior to 1 January 1976 plaintiff William G. Snow was overseer of farming operations for Grovewood, Inc. Snow kept his farming equipment and tools in a feed barn belonging to Grovewood. In the early morning hours of 1 Janaury 1976 the barn and its contents were destroyed by fire. Plaintiffs instituted this action to recover damages for their loss, alleging that the barn and farming equipment therein had been destroyed by a fire caused by defendant's negligence.

Plaintiffs offered evidence tending to show that defendant was engaged in the transmission and sale of electrical power and furnished electricity to Grovewood's premises; that Grovewood, Inc. owns two tracts of land in Surry County upon which are located five feed barns, numerous tool sheds, some tenant houses and tobacco barns; that one of the feed barns, about 30 by 60 feet and constructed of weatherboard, was destroyed by fire on 1 January 1976; that the barn had a cement floor and was two stories tall; that sheds were attached to the front (south) and back (north) sides of the barn; that William G. Snow lived about two and one-half miles west of the barn and kept his farming equipment in it, including a tractor with front and rear cultivators, a baler and numerous small tools, such as rakes, hoes, shovels, pitchforks, etc.

The barn had no electrical outlets or wiring on the inside, and William G. Snow had never used any electricity on the inside of the barn or paid for any electrical services to the barn. There was only one outlet on the outside, coming directly from the meter box located on the front (south) side of the barn underneath the shed. The meter box was attached to the barn itself and was connected to a large wire, called the riser wire, that came down the south side of the barn from the weatherhead under the eaves. At the weatherhead the riser wire was connected to the large wire leading from the weatherhead to a power pole approximately 300 yards across the highway from the barn. Defendant owned and maintained a transformer located on the same pole. Seven thousand, two hundred volts of electricity entered the transformer from the transmission line and were supposedly reduced by the transformer to appropriate voltage levels for the consumer, *i.e.*, 120 or 240 volts.

Evidence for plaintiffs further tends to show that the meter had been inactive for ninety-nine months, *i.e.*, there was no indication that any power was used through that meter and no one had been billed for electric current during that period of time. On 1 December 1975 an employee of Duke Power Company named Kent Gibson removed the meter from the meter box. A few days later Ed Snow (William Snow's father) put a plastic bag over the meter box to keep children out of it.

Ed Snow lived 200 yards from the barn. He was awakened about 4:30 a.m. on 1 January 1976, went to the porch of his home,

and saw the barn was on fire. He saw "the fire burning just right up over the meter box just about the size of a big table. . . . Right up over the meter box. . . . [N]owhere else, only right over the top of that box." He called the fire department. Within ten to fifteen minutes the barn "was afire halfway back." The weather was clear but windy, the wind blowing from north to south. Despite all efforts of the fire department, the barn and its contents were completely destroyed. Following the fire, about 10 a.m. that morning, an employee of Duke Power Company disconnected the wire leading from the power pole to the barn.

Evidence for plaintiffs further tends to show that William G. Snow did not have any gasoline or other combustible materials stored in the barn and that there were no stoves of any kind in the barn. At the time of the fire it was very windy but there was no rain, thunder or lightning. William G. Snow did have an electric fence encompassing an area at the back (north) side of the barn; however, the fence was not energized during the night of the fire.

Fire Chief Bullin testified that the back (north) side of the barn was not burning when the firemen arrived on the scene; that they walked around the barn, found the wire leading to the power pole charred at the end closest to the barn, and received an electrical shock from it. Someone called Duke Power Company to disconnect it. The fire chief found no evidence of arson.

Defendant offered evidence tending to show that Duke Power Company owned and installed the electric line from a utility pole to a point at the edge of the roof of the barn (the weatherhead) twelve feet above the ground. The riser wire was supplied and installed by the customer's electrician. That wire ran down the side of the barn eight or ten feet and connected to the meter box which contained the meter. There was no electricity to the barn except to the test block in the meter box. Below the meter box was a "pigtail" with a "plug-in."

Kent Gibson, who had been employed by defendant for thirty years, removed the meter from the meter box on 1 December 1975. He cut the seal, removed the lid, loosened the bolts that held the meter in place, lifted the meter out, replaced the lid and resealed the box with a metal seal. There was no current flowing through the meter prior to its removal. Current from the riser

Snow v. Power Co.

wire reaches the meter by means of a test block inside the meter box to which wires leading to the meter are attached. In order to remove the meter Mr. Gibson had to disengage from the test block the wires which fed electricity from the riser wire to the meter. Thus, after removal of the meter the wires inside the meter box which connected the meter to the test block were no longer hot as the bolts had been loosened which attached these wires to the test block; however, the riser wires which led to the meter box remained hot. "*It was hot up to the meter,* but it wasn't hot in the meter."

Evidence offered by the parties concerning the amount of damages is not set out since no issue concerning the amount of damages is raised on this appeal.

At the close of all the evidence defendant's motion for a directed verdict was denied. The usual issues of negligence and damages were submitted to the jury, and the judge charged, among other things, on res ipsa loquitur. The jury answered the issues in favor of plaintiffs, awarding William G. Snow $5,000 damages and Grovewood, Inc., $2,000. Judgment was entered accordingly, and defendant appealed. The Court of Appeals vacated the judgment and remanded the case for entry of a directed verdict in favor of defendant. We allowed plaintiffs' petition for discretionary review of that decision.

*Tornow and Lewis by Michael J. Lewis, attorneys for plaintiff appellants.*

*William I. Ward, Jr.; Folger and Folger by Fred Folger, Jr., attorneys for defendant appellee.*

HUSKINS, Justice.

The sole question presented on this appeal is whether the evidence is sufficient to repel defendant's motion for directed verdict and carry the case to the jury. We hold that it is.

Defendant's motion at the close of all the evidence for directed verdict under Rule 50(a), Rules of Civil Procedure, presents the question whether the evidence, viewed in the light most favorable to plaintiff, will justify a verdict in his favor. *Rayfield v. Clark,* 283 N.C. 362, 196 S.E. 2d 197 (1973). In passing

upon such motion, "the evidence in favor of the non-movant must be deemed true, all conflicts in the evidence must be resolved in his favor and he is entitled to the benefit of every inference reasonably to be drawn in his favor." *Summey v. Cauthen*, 283 N.C. 640, 197 S.E. 2d 549 (1973). It is only when the evidence is insufficient to support a verdict in the non-movant's favor that the motion should be granted. *Rappaport v. Days Inn*, 296 N.C. 382, 250 S.E. 2d 245 (1979).

[1] Electricity is an inherently dangerous substance. "Consequently, a company supplying it to a customer's building must use a high degree of foresight and must exercise the utmost diligence consistent with the practical operation of its business." *Keith v. Gas Co.*, 266 N.C. 119, 146 S.E. 2d 7 (1966). Such company is not, however, liable for damages resulting from a fire, and is entitled to directed verdict, unless plaintiff presents evidence sufficient to justify a jury in finding that the fire was "proximately caused by the electricity supplied by the company to the building and that, in so supplying the electricity, the company was negligent." *Id.*

Plaintiffs contend the doctrine of res ipsa loquitur applies in the factual context of this case and that, aided by said doctrine, the evidence is sufficient to carry the case to the jury. Res ipsa loquitur is an evidentiary rule which in a proper factual setting permits a party to prove the existence of negligence by merely establishing the circumstances of an occurrence that produces injury or damage. 2 Stansbury, N.C. Evidence, § 227 (Brandis Rev. 1973). The principle of res ipsa loquitur is generally stated as follows: "[W]hen a thing which causes injury is shown to be under the management of defendant, and the accident is such as in the ordinary course of things does not happen, if those who have the management use the proper care, it affords reasonable evidence, in the absence of explanation by the defendant, that the accident arose from a want of care." *Newton v. Texas Co.*, 180 N.C. 561, 105 S.E. 433 (1920). Simply put, the doctrine of res ipsa loquitur recognizes that "common experience sometimes permits a reasonable inference of negligence from the occurrence itself." Stansbury, supra, § 227. Thus, in order to be aided by the inference of negligence permitted under res ipsa loquitur plaintiffs in this case must establish: (1) that the fire which destroyed the barn was electrical in origin; (2) that defendant had the exclusive control and management of the electrical current which caused

the fire; and (3) that such electrical fires do not ordinarily occur if the party who has control of the electrical current uses proper care.

When laid alongside the elements necessary to invoke the doctrine of res ipsa loquitur, what does the evidence show?

[2] With respect to the sufficiency of the evidence on the *actual cause* of the fire, we note at the outset that the origin of a fire may be established by circumstantial evidence. *Jenkins v. Electric Co.*, 254 N.C. 553, 119 S.E. 2d 767 (1961); *Simmons v. Lumber Co.*, 174 N.C. 220, 93 S.E. 736 (1917). If the facts proven establish the more reasonable probability that the fire was electrical in origin, then the case cannot be withdrawn from the jury though all possible causes have not been eliminated. *Patton v. Dail*, 252 N.C. 425, 114 S.E. 2d 87 (1960); *Drum v. Bisaner*, 252 N.C. 305, 113 S.E. 2d 560 (1960); *Fitzgerald v. R.R.*, 141 N.C. 530, 54 S.E. 391 (1906). "Whether the circumstantial evidence is sufficient 'to take the case out of the realm of conjecture and into the field of legitimate inference from established facts,' must be determined in relation to the attendant facts and circumstances of each case." *Drum v. Bisaner, supra* (citations omitted).

The evidence tends to show that the fire was first seen burning "just right up over the meter box" on the front (south) side of the barn. The fire was about the size of a "big eating table" and in its first stages was strictly localized to the area right above the meter box. The fire burned from the front to the back of the barn (south to north). The back (north) side of the barn was not burning when reached by fire fighters some ten to twenty minutes after their arrival on the scene. On the night of the fire the wind was blowing strongly from north to south.

The cable running from the utility pole to the weatherhead on the south side of the barn had electrical current running through it on the night of the fire. Similarly, the riser wire running from the weatherhead to the meter box had electrical current running through it to the test block in the meter box. Soon after his arrival at the scene, the fire chief found the cable running from the weatherhead to the power pole charred at the end closest to the barn. The fire chief touched the wire and received an electrical shock from it.

Plaintiffs did not have any gasoline or other combustible materials stored in the barn. There were no stoves of any kind in the barn. There were no electrical outlets or other wiring inside the barn. The electric "weed chopper" fence which enclosed the pasture on the back side of the barn was not energized on the night of the fire. No evidence of arson was found by the fire chief. On the night of the fire there was no lightning or thunder after 2 a.m.

The foregoing evidence, considered in the light most favorable to plaintiffs, would permit a jury to find: (1) that the fire originated at a point where the wiring connecting the weatherhead to the meter box was "hot" with electrical current; (2) that the initially compact and concentrated nature of the flames was consistent with an electrical fire, *see Collins v. Electric Co.*, 204 N.C. 320, 168 S.E. 500 (1933); (3) that the fire took some time to spread from the front of the barn — where the "hot wires" were located — to the back of the barn. Moreover, plaintiffs' evidence pointing affirmatively to the electrical origin of the fire is bolstered by other evidence tending to eliminate other likely causes of the fire. This evidence tends to negative stored combustibles, the electric "weed chopper" fence, interior wiring, stoves, electrical appliances, arson, and lightning as probable causes of the fire. It may be said then, that the evidence on the actual cause of the fire is not merely conjectual or speculative but is such as would warrant a jury in forming a legitimate conclusion that the fire was caused by electricity transmitted over defendant's power lines.

In concluding that there was insufficient evidence as to the cause of the fire, the Court of Appeals relied on *Phelps v. Winston-Salem*, 272 N.C. 24, 157 S.E. 2d 719 (1967), and *Maharias v. Storage Company*, 257 N.C. 767, 127 S.E. 2d 548 (1962). This reliance is misplaced. The holdings in *Phelps* and *Maharias* are limited to the particular facts presented in those cases and have no application to the very different factual context presented here. We note, moreover, that the facts in this case bear a stronger resemblance to the facts in *Collins v. Electric Co., supra,* than to the facts in *Phelps* and *Maharias*. In *Collins*, this Court concluded that the evidence of causation was sufficient to permit submission of the issue to the jury.

[3] Plaintiffs must next establish that defendant had the exclusive control and management of the electrical current which allegedly caused the barn to burn. The evidence on this point tends to show that defendant generated the electricity which caused the fire. Defendant transmitted this electricity to plaintiffs through high voltage transmission lines which led to a power pole located approximately 300 yards across the highway from the barn. On this same pole was a transformer designed to reduce the high voltage electricity entering it from the transmission lines to appropriate voltage levels for the consumer. This electricity was transmitted from the utility pole to plaintiffs' barn by a cable which was connected to a weatherhead which itself was attached to the eaves on the front side of plaintiffs' barn. At the weatherhead, the cable from the power pole was connected to a large wire, called the riser wire, which ran down the side of the barn some eight to ten feet and connected to the test block in the meter box installed some four to five feet above the ground.

With the exception of the riser wire, defendant owned the entire transmission system which brought power from its generators to the barn. Plaintiff Grovewood, Inc. owned and originally installed the riser wire; however, defendant *made and maintained the connections* between the riser wire and its transmission cable at the weatherhead and also at its meter box. Moreover, defendant's meter readers and servicemen regularly inspected the riser wire on their visits to the premises as part of their assigned duties.

The foregoing evidence, considered in the light most favorable to plaintiffs, indicates that defendant maintained the system by which electricity was generated and delivered to plaintiffs' barn and thus permits a jury finding that defendant had the exclusive control and management of the instrumentality which allegedly caused the fire. Plaintiff Grovewood, Inc.'s ownership and installation of the riser wire does not preclude a jury finding of exlcusive control in light of the evidence tending to show that the riser wire was used exclusively by defendant as one of the links in the transmission system by which electricity was delivered to plaintiffs' barn. This evidence indicates that defendant made and maintained the connections between the riser wire and other links in the transmission system — *i.e.*, the weatherhead and the meter box — and regularly inspected the riser wire. Thus,

a jury could reasonably infer that defendant, while not the legal owner of the riser wire, in effect maintained exclusive control over the suitability and safety of the riser wire as a transmitter of electricity.

[4]  Plaintiffs' evidence is sufficient to permit a finding that the fire was caused by electricity transmitted over power lines under the exclusive management and control of defendant. The final question, then, in determining if a permissible inference of negligence arises under the doctrine of res ipsa loquitur, is whether such fires ordinarily occur in the absence of negligence. Our cases have generally recognized that it is not within the realm of ordinary experience for injuries of this nature to occur in the absence of negligence. *See Collins v. Electric Co., supra; Lawrence v. Power Co.,* 190 N.C. 664, 130 S.E. 735 (1925); *McAllister v. Pryor,* 187 N.C. 832, 123 S.E. 92 (1924); *Turner v. Power Co.,* 154 N.C. 131, 69 S.E. 767 (1910). In *Collins v. Electric Co., supra,* we held res ipsa loquitur to be applicable in a factual context closely resembling the facts in this case. Accordingly, we conclude that a permissible inference of negligence arises here under the doctrine of res ipsa loquitur and that plaintiffs have made out a case for the jury on the issue of defendant's negligence. It follows that defendant's motion for directed verdict at the close of all the evidence was properly denied by the trial court.

For the reasons stated the decision of the Court of Appeals is reversed and the cause remanded for reinstatement of judgment on the verdict.

Reversed and remanded.