960 F.2d 146
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Rufus D. LILLEY; Catherine T. Lilley, wife, Plaintiffs-Appellants,
v.
CAPE HATTERAS ELECTRIC MEMBERSHIP CORPORATION, Defendant-Appellee.
 No. 90-2487.
 United States Court of Appeals,
Fourth Circuit.
 Argued: June 4, 1991
Decided: April 21, 1992
 
 Before ERVIN, Chief Judge, WIDENER, Circuit Judge, and ELLIS, United States District Judge for the Eastern District of Virginia, sitting by designation.
 ARGUED: Branch W. Vincent, III, Twiford, O'Neal & Vincent, Elizabeth City, North Carolina, for Appellants.
 Donald Carpenter Prentiss, Hornthal, Riley, Ellis & Maland, Elizabeth City, North Carolina, for Appellee.
 ON BRIEF: Russell E. Twiford, Twiford, O'Neal & Vincent, Elizabeth City, North Carolina, for Appellants.
 M. H. Hood Ellis, Hornthal, Riley, Ellis & Maland, Elizabeth City, North Carolina, for Appellee.
 OPINION
 PER CURIAM:
 
 
 1
 Rufus D. Lilley and his wife, Catherine T. Lilley, appeal from an order of the district court granting the defendant's motion for summary judgment. We affirm.
 
 
 2
 On May 1, 1989, the Lilleys brought a diversity action against Cape Hatteras Electric Membership Corporation in the United States District Court for the Eastern District of North Carolina. The plaintiffs sought damages in connection with an incident that occurred on May 10, 1986. On that date, Lilley was staying in his house trailer in Avon, North Carolina. The plaintiffs were members of the Cape Hatteras Electric Membership Corporation and obtained electricity for their trailer from the defendant. The trailer was heated by a Coleman Presidential II Oil Gun furnace. At approximately 11:30 p.m., the lights and the furnace in the trailer went off for twenty-five to thirty minutes. When the lights came back on, the furnace did not. Lilley then removed the doors on the furnace and pushed two reset buttons. The furnace resumed operation and ran for the next five to ten minutes. While Lilley was standing in front of the furnace with the doors removed, the lights dimmed and went out completely for a few seconds. When the power came back on, Lilley noticed that the lights burned more brightly than usual. As the furnace started running again, a flame exploded out through the open doors. Lilley was struck in the stomach by the flame and was knocked backward against a wall. The furnace continued to operate normally after emitting the flame.
 
 
 3
 The plaintiffs sought to recover damages for personal injuries resulting from this incident. Lilley relied upon theories of negligence and breach of warranty, while Mrs. Lilley advanced a loss of consortium claim. Both plaintiffs also sought punitive damages. The defendant responded by filing a motion for summary judgment. The district court granted the defendant's motion and this appeal followed.
 
 
 4
 The plaintiffs contend that the district court erred in its disposition of the claims asserting negligence and breach of warranty. With regard to negligence, the district court recognized that under North Carolina law, a company supplying electricity to a customer must exercise "a high degree of foresight and ... the utmost diligence consistent with the practical operation of its business." Snow v. Duke Power Co., 256 S.E.2d 227, 231 (N.C. 1979) (quoting Keith v. United Cities Gas Co., 146 S.E.2d 7, 15 (N.C. 1966)). The plaintiffs contend that the defendant breached its duty by making no effort at all to remove salt deposits from its transmission lines. This salt contamination, they argue, caused a power outage and fluctuation that resulted in the explosion of their furnace.
 
 
 5
 The defendant has submitted affidavits containing expert opinion upon the questions raised by the plaintiffs' allegations. These affidavits indicate that because the defendant's service area is exposed to airborne salt water spray from the Atlantic Ocean, its transmission lines develop salt deposits that at times become highly conductive and lead to power fluctuations and outages. While no procedure currently known can prevent salt buildup and contamination, two methods are being used by power companies to reduce the frequency of power outages due to such contamination. Some companies use a method that involves washing their power lines, while others employ what are called "fogbowl insulators." The defendant's affidavits include testimony that most power companies, and particularly small ones such as the defendant, do not wash their lines because such a procedure is very expensive and of limited effect and duration. Fogbowl insulators, on the other hand, are described as a state of the art method for reducing salt contamination. Cape Hatteras Electric Membership Corporation, according to an affidavit from its Manager, reduced the frequency of power outages due to salt contamination by employing fogbowl insulators, which were in use in May 1986.
 
 
 6
 Further expert opinion presented by the defendant states that no electric power system can supply an uninterrupted level of power free from fluctuations or outages; such conditions are expected and acceptable in the industry. Fluctuations between 114 and 126 volts are within the "accepted range[ ]." Following an interruption in service or a power outage, voltage may briefly be higher or lower than the normal range, a consequence that is described as unavoidable and accepted in the electric utility industry.
 
 
 7
 The plaintiffs' evidence, on the other hand, when taken in the light most favorable to the plaintiffs merely suggests that a power fluctuation occurred on the date in question and that some other power companies wash their lines to combat salt contamination. As the district court noted, however, negligence will ordinarily"not be inferred from the mere fact of an occurrence which injures a plaintiff." Kekelis v. Whitin Machine Works, 160 S.E.2d 320, 322 (N.C. 1968). Rather, the plaintiff must produce evidence to show fault on the part of the defendant. See Snow v. Duke Power Co., 256 S.E.2d at 231 (stating that a power company "is not ... liable for damages resulting from a fire" unless "the company was negligent" in supplying the electricity). We agree with the district court that, despite their allegations of negligence with regard to salt contamination, the plaintiffs have failed to point to any evidence that the power fluctuation was caused by any breach of duty on the part of the defendant. The only evidence before us indicates that fogbowl insulators are a state of the art method of dealing with salt contamination and the plaintiffs have submitted no evidence that this method is less effective than line washing. Based upon this record, we find no basis for concluding that the defendant has breached its duty of care by choosing to maintain its transmission lines by using fogbowl insulators. Accordingly, we are of opinion that the plaintiffs have not produced sufficient evidence on their negligence claim to withstand a motion for summary judgment.
 
 
 8
 The plaintiffs seek to remedy this deficiency by invoking the doctrine of res ipsa loquitur. Generally, for this doctrine to apply, the plaintiff must prove "(1) that there was an injury, (2) that the occurrence causing the injury is one which ordinarily does [not] happen without negligence on someone's part, (3) that the instrumentality which caused the injury was under the exclusive control and management of the defendant." Shadkhoo v. Shilo East Farms, Inc., 399 S.E.2d 319, 321 (N.C. 1991) (quoting Jackson v. Neill McKay Gin Co., 120 S.E.2d 540, 542 (N.C. 1961)). As discussed previously, the plaintiffs contend that the power outage and fluctuation caused the explosion in question. They have failed, however, to present any evidence to rebut the defendant's evidence that power outages and fluctuations regularly happen without negligence on anyone's part. The unrebutted testimony of defendant's experts is that other circumstances, including wind and lightning, can lead to outages and that fluctuations are present in all electric power systems. Furthermore, because plaintiffs' own evidence indicates that the furnace that emitted the flame injuring Lilley was under his control, and apparently had been since the date of its purchase, they have not made the required showing of exclusive control and management of this instrumentality by the defendant. The district court therefore did not err in rejecting the plaintiffs' res ipsa loquitur argument.
 
 
 9
 With regard to the plaintiffs' breach of implied warranty claims,* which involve the implied warranty of merchantability under N.C.G.S. § 25-2-314 and implied warranty of fitness for particular purpose under N.C.G.S. § 25-2-315, the plaintiffs argue that the district court erred in rejecting their position that electricity comes within the definition of "goods" found in N.C.G.S.s 25-2-105. They concede that their position has not been adopted by any North Carolina court, but urge us to decide the issue on the basis of authority from other jurisdictions. Even assuming, for the purposes of argument and without deciding the matter, that the plaintiffs are correct in their construction of the term goods, their implied warranty claims fail on another ground. The condition which the plaintiffs claim constitutes a breach under their implied warranty theories is the fluctuation of voltage of the electricity entering the trailer on the date in question. They have, however, offered no evidence to rebut the defendant's evidence that fluctuations within a range of 114 to 126 volts are customary in the industry and that voltage levels outside of this range are acceptable for short periods of time. The plaintiffs assert that the electricity supplied to their trailer was "excessive," but they have presented no evidence concerning the proper voltage that should have been transmitted into the trailer or the level that actually was transmitted at the relevant time. They have therefore not made a showing that the fluctuation was outside of the accepted range. We agree with the district court that the plaintiffs have failed to make a sufficient showing that the electricity supplied by the defendant was defective.
 
 
 10
 Accordingly, the judgment of the district court is
 
 
 11
 AFFIRMED.
 
 
 
 *
 Before the district court, the plaintiffs asserted an express warranty claim under N.C.G.S. § 25-2-313. If we consider that this issue is properly raised on appeal, we believe that the district court did not err in rejecting this portion of the Lilley's claim