An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-509

Filed 7 January 2026

New Hanover County, No. 20CVS002997-640

WELDON MOORE, Plaintiff,

v.

RICHMEN ENTERPRISES, LLC d/b/a DARTH VAPOR; JOYETECH USA, INC.; and MIDWEST GOODS, INC., Defendants.


Appeal by Defendant Midwest Goods, Inc. from judgment entered 19 April 2023 and orders entered 27 July 2023 and 15 March 2023 by Judge G. Frank Jones in New Hanover County Superior Court. Heard in the Court of Appeals 30 January 2025.

*Poisson, Poisson, & Bower, PLLC, by Attorneys Frederick Davis Poisson III and E. Stewart Poisson, for the plaintiff-appellee.*

*Richardson Thomas, LLC, by Attorney Grace Babcock, for the plaintiff-appellee.*

*Hedrick, Gardner, Kincheloe & Garofalo, LLP, by Attorneys M. Duane Jones and Elizabeth H. Bennett, for the defendant-appellant Midwest Goods, Inc.*

*Bowman & Brooke LLP, by Attorney Trevor W. Carolan, pro hac vice, for the defendant-appellant Midwest Goods, Inc.*


STADING, Judge.

Midwest Goods, Inc. ("Midwest") appeals from final judgment entered upon a

jury verdict finding it jointly and severally liable to Weldon Moore ("Plaintiff") for the injuries he sustained when a lithium-ion battery exploded in his pants pocket. Midwest also appeals from the trial court's orders that denied its Rule 59 motion for a new trial, Rule 50 motion for judgment notwithstanding the verdict, and Rule 42 motion to bifurcate. *See* N.C. Gen. Stat. §§ 1A-1, Rules 42, 50, 59 (2023). On appeal, Midwest asserts the trial court erroneously denied its motion to bifurcate, its directed verdict motions, and its motion for judgment notwithstanding the verdict for several reasons. After careful consideration, we affirm.

## I. Factual and Procedural Background

This case deals with the liability of a wholesale supplier of vaping products after a consumer sustained injuries from one of its products that entered the stream of commerce. The record tends to show that Midwest, a wholesaler, supplied rechargeable 18650 lithium-ion batteries to a retailer of vaping products in Wilmington—Richmen Enterprises, LLC d/b/a Darth Vapor ("Darth Vapor"). Darth Vapor sold one of those batteries to Plaintiff, who used it in his Joyetech electronic cigarette for the purposes of vaping. While on a job site one morning, Plaintiff alleged the battery exploded in his pants pocket, causing third-degree burns to his legs. As a result, Plaintiff filed a complaint[1] against Midwest, Darth Vapor, and Joyetech

---

[1] Plaintiff's complaint also asserted causes of action against Ex MV, LLC; MadVapes Franchising, LLC; and AMV Holdings, LLC. However, "Plaintiff previously settled with" these parties.

USA, Inc.[2] (collectively, "Defendants") grounded in negligence and product liability. Plaintiff also asserted that Darth Vapor breached the implied warranties of merchantability and fitness for a particular purpose.

At the outset, Defendants moved the trial court to bifurcate the liability and damages phases of the trial pursuant to N.C. Gen. Stat. § 1A-1, Rule 42(b)(3) (2023). Midwest argued it was entitled to have separate trials on those issues and to exclude evidence of compensatory damages. The trial court denied the motion, reasoning that Midwest had "not stipulated that plaintiff was injured as a direct and proximate result of defendant's alleged negligence." The trial court further reasoned that: "a single proceeding promotes judicial economy and efficiency by eliminating duplicative witnesses, and redundant procedures"; bifurcation would cause "increased scheduling burdens . . . as well as the likelihood of increased expense to taxpayers"; bifurcation was unnecessary since there were no cross-claims or counterclaims; bifurcation could confuse the jury and prejudice Plaintiff; bifurcation would cause difficulties with respect to jury selection; bifurcation was unnecessary since "the issues of liability and damages [were] sufficiently interwoven"; and bifurcation was unnecessary since Plaintiff solely sought "non-economic damages."

Plaintiff's jury trial commenced on 13 March 2023, in which he testified to having purchased a green 18650 rechargeable lithium-ion battery from Darth Vapor

---

[2] Neither Darth Vapor nor Joyetech USA, Inc. appealed from the trial court's judgment or orders.

on 5 February 2019. Plaintiff recalled that upon entering Darth Vapor, he showed a salesperson his electronic cigarette and requested a replacement battery. The salesperson returned with an unpackaged battery, which Plaintiff purchased. Plaintiff testified that the battery was green and did not indicate a specific manufacturer's name. Plaintiff added that based on this interaction with the salesperson, he believed the battery would be compatible with his device. Several months before purchasing this battery from Darth Vapor, Plaintiff testified to purchasing a green Samsung 18650 lithium-ion battery from MadVapes—another retailer of vaping products in Wilmington. The receipt for the battery from MadVapes confirmed it was a Samsung battery purchased on 20 October 2018.

On 12 April 2019, Plaintiff was working as an electrician's assistant on a job site. Plaintiff testified that while walking towards his toolbox, his electronic cigarette and accompanying battery exploded in his cargo pants pocket, causing his leg to catch fire. At the time of the explosion, Plaintiff had two batteries on his person—the green battery from Darth Vapor and a brown "backup battery." Plaintiff, however, noted that he "kept the green battery in the device," and that "the brown battery was [his] backup battery to where, if [he is] on the job, and [he] can't charge [the green battery], [he] can always go and grab that battery." Plaintiff testified that he was certain the unlabeled green battery he purchased from Darth Vapor was in the electronic cigarette at the time it exploded rather than the brown battery or the green Samsung battery:

Q. Okay. Now, you've testified for this jury that the green battery that blew up on you in April of 2019 you purchased from Darth Vapor?

A. Yes.

. . . .

A. Because it was . . . a new battery. And it was closest to the time of the explosion, the green battery. And then, also, we found out that . . . the battery that exploded wasn't a . . . Samsung. It was another kind. So the battery I bought from MadVapes . . . was a Samsung. But from the test results, it said the battery wasn't a Samsung, the green battery that exploded.

David Rondinone testified as an expert witness in mechanical engineering at trial. Mr. Rondinone opined that 18650 lithium-ion batteries are not safe for use in vaping devices because the battery is "physically and electrically unprotected." Mr. Rondinone reasoned that using an 18650 lithium-ion battery in a vaping device can cause "thermal runaway," and that these types of batteries are ordinarily used for devices that use "battery packs" such as power tools:

> A. . . . A battery of this design, which is the same across all 18650s that I've ever seen -- and I don't know how many hundreds I've seen of them in this stage -- you have positive in the middle and you have negative on the edge. And the distance between the raised positive center and the raised negative rim is only a few millimeters; it's very, very close. And to short a battery like this, all you need to do is remove the wrapper -- and then, the washer will just push out of the way -- and then, get anything that conducts electricity -- piece of metal, a coin, a key. And it just has to span from the middle to the edge. It's got just to be just a few-millimeter span.

> And if it does that and it touches them both at the same

time, then the battery can experience a thermal runaway, which is basically -- it behaves like a firecracker. It starts to eject very hot contents, which are essentially on fire. And it's what we call the battery explosion.

. . . .

Q. And typically, what is the design application that the major manufacturers intended these batteries to be used for?

A. Yeah. They're very, very clear about this. The . . . major manufacturers intend these batteries to be used for battery packs: an assembly of batteries put together inside a physically protected casing of some sort, with an electronic circuit to also protect the batteries. A good example of this would be power tools. If you've ever used a cordless drill or a cordless saw – I've taken apart a number of those battery packs, and they are indeed 18650s. [T]here's a bunch of them in there, all . . . welded together, basically, with little . . . tabs. But there's also a little circuit in there that protects them. And they're inside of a physically protective case. So for example, with that type of intended use, a user would never be able to short the battery. It'd be physically impossible, because it would be inside this case.

Mr. Rondinone added that the major manufacturers of these batteries—Samsung, Sony, and LG—prohibit using them in vaping devices:

Q. Okay. I guess, do [the major manufacturers] take a position on whether their 18650 [batteries] should ever be used individually or by a consumer in any application?

A. Yeah. They take a very strong position that these batteries should never be sold to an end consumer for a replaceable-battery use. They're all very, very specific, and which obviously includes vaping, which I think they specifically prohibit as well. But they're very specific that they're only intended for battery-pack manufacturers or people who integrate them into a protective pack.

Richard Marzola, Midwest's expert witness in electrical engineering, conceded that the major manufacturers have been telling people not to use these batteries for the purposes of vaping since as early as 2015:

> Q. And you would agree with me that all three of them specifically tell people not to use these batteries for this very specific use, vaping?
>
> A. They do now. Yes.
>
> . . . .
>
> Q. Sony 2015, any reason to agree or disagree with that?
>
> A. No, none at all.
>
> Q. LG, 2016/'17, any reason to disagree with that?
>
> A. I think it was late '17, but agreed. I think that's when they first started talking about that. Yes.

Mr. Marzola added that authentic 18650 batteries manufactured by Sony and LG expressly warn against using the product outside of a battery pack or in a vaping device.

Mr. Rondinone also conducted a CT scan on the batteries to discern which one caught fire. Ultimately, Mr. Rondinone opined the battery that caught fire was not manufactured by Samsung, Sony, or LG. Mr. Marzola agreed that the subject battery was not manufactured by Samsung, Sony, or LG. And at the outset of trial, the parties collectively stipulated that "the incident battery is not a Samsung or Sony"; "the incident battery was green"; and that "the brand of the incident battery is not known."

Several employees from Darth Vapor provided testimony at trial. Brian Caiazzo, an employee who ordered and maintained the inventory for Darth Vapor, noted that from 2018 through April 2019, "[a]ll batteries were purchased from . . . Midwest." Brian Caiazzo testified that the battery shipments from Midwest would come in a set of boxes that he could open to inspect the batteries. He added that these boxes were not sealed and did not have any text or markings on them. Brian Caiazzo noted that, among other products, he sold "18650 batteries with green wrappers." That said, Brian Caiazzo conceded that Darth Vapor did not have an electronic inventory management system. Daniel Caiazzo, another Darth Vapor employee, confirmed that Darth Vapor did not have any available records, including records showing which distributors it purchased its products from.[3]

Notwithstanding Darth Vapor's lack of records, Midwest provided invoices from its orders with Darth Vapor at trial. Those invoices indicate that Midwest supplied Darth Vapor with green 18650 batteries like the one that caused Plaintiff's injury. Mudassir Yasin, the managing director for Midwest, testified that Darth Vapor regularly purchased LG and Sony 18650 batteries from Midwest. Mr. Yasin noted that from September 2018 through March 2019, Darth Vapor purchased approximately 130 batteries. However, Mr. Yasin conceded that Midwest did not

---

[3] Daniel Caiazzo also stated that upon opening Darth Vapor in Wilmington, approximately 90% of its supplies, including batteries, were sourced from Midwest. In the beginning, he handled the ordering for the store, but by the end of 2017, he was no longer handling ordering for the store.

source the batteries directly from Sony or LG; instead, Midwest regularly sourced its 18650 batteries from a company called E-Cig Fiend. Mr. Yasin further conceded that E-Cig Fiend does not manufacture batteries; is not a subsidiary of Samsung, Samsung SDI, or Sony; is not an authorized dealer for LG or Sony; and that he never asked E-Cig Fiend where the batteries came from. He also conceded that when he received shipments from E-Cig Fiend, the boxes did not contain any official logos or trademarks.

Tom Murphy, the general counsel for Midwest, corroborated that Midwest purchased its batteries from E-Cig Fiend. To his knowledge, E-Cig Fiend was not owned or operated by LG, Sony, or Samsung. Mr. Murphy added that when Midwest received products from suppliers, its employees would "spot-check" the boxes as they came in. Mr. Murphy explained: "If we get a pallet that's got 20 boxes on it, they may open four or five of them." Mr. Murphy added that when receiving shipments of batteries, they would arrive in unmarked white boxes without any logo or trademark, and that the batteries did not contain a warning "not to use it in a . . . device." According to Mr. Murphy, the only indication that the batteries were "authentic" products was the labeling on the invoices it received from E-Cig Fiend. Moreover, Mr. Murphy conceded that, around March 2019, Midwest "became aware that [the major manufacturers of 18650 batteries] were saying" the batteries should not be used in vaping devices.

At the close of Plaintiff's case-in-chief, Midwest moved for a directed verdict,

contending that Plaintiff had not produced evidence that Midwest supplied the incident battery. The trial court denied that motion. Midwest renewed its motion for a directed verdict on the same grounds at the close of all evidence again, the trial court denied the motion. Midwest also made a cross-motion for a directed verdict at the close of all evidence based on the sealed-container defense under N.C. Gen. Stat. § 99B-2(a) (2023) in response to Plaintiff's motion for a directed verdict on the same issue. Midwest argued that it acquired the batteries from its supplier in individual white boxes and sold them to customers in the same packaging with no reasonable opportunity to inspect each battery. The trial court denied both Plaintiff's and Midwest's motions.

The jury later returned a verdict for Plaintiff. The jury concluded that: Midwest supplied the incident battery to Darth Vapor; Plaintiff was injured by Midwest's negligence; and Midwest unreasonably failed to provide adequate warning or instruction with the battery, proximately causing Plaintiff's injury. The jury also determined that the batteries were not provided by Midwest to Darth Vapor in sealed containers, and that Midwest had a reasonable opportunity to inspect the products in a manner that would have or should have revealed the claimed defect. The jury ultimately awarded Plaintiff $1,630,000.00 in damages jointly and severally against Defendants.

Midwest moved for judgment notwithstanding the verdict ("JNOV") under N.C. Gen. Stat. § 1A-1, Rule 50(b) thereafter, and in the alternative, for a new trial

under N.C. Gen. Stat. § 1A-1, Rule 59. Midwest argued: the evidence did not support the jury's finding that it had supplied the incident battery; the trial court abused its discretion by failing to bifurcate the trial; and the sealed-container defense applied as a matter of law. The trial court denied both motions, and Midwest timely appealed.[4]

## II. Jurisdiction

This Court has jurisdiction over Defendant's appeal pursuant to N.C. Gen. Stat. § 7A-27(b)(1) (2023) ("From any final judgement of a superior court . . . .").

## III. Analysis

Midwest asserts the trial court erroneously denied its motions for JNOV and directed verdict because "the evidence at trial was insufficient to support the jury's verdict that Midwest supplied the incident green battery," and "the sealed container doctrine applied as a matter of law." Midwest also contends the trial court abused its discretion in denying Midwest's motion to bifurcate the trial proceedings because Midwest satisfied the criteria under N.C. Gen. Stat. § 1A-1, Rule 42(b)(3).

---

[4] *See* N.C. R. App. P. 3(c)(3) (providing that "if a timely motion is made by any party for relief under Rules 50(b), 52(b) or 59 of the Rules of Civil Procedure, the thirty-day period for taking appeal is tolled as to all parties until entry of an order disposing of the motion and then runs as to each party from the date of entry of the order or its untimely service upon the party, as provided in subdivisions (1) and (2) of this subsection (c).").

## A.   JNOV; Directed Verdict

Midwest contends Plaintiff failed to provide sufficient evidence at trial showing Midwest supplied Darth Vapor with the green battery that caused Plaintiff's injuries. Midwest further contends it satisfied the statutory criteria to invoke the sealed container defense because "sold the batteries to its customers in the same packaging" and "had no reasonable opportunity to inspect each individual boxed battery." *See* N.C. Gen. Stat. § 99B-2.  As a result, Midwest maintains the trial court erred by denying its JNOV and directed verdict motions.  We disagree.

"The question is whether there is sufficient evidence to sustain a jury verdict in the non-moving party's favor or to present a question for the jury." *Davis v. Dennis Lilly Co.*, 330 N.C. 314, 411 S.E.2d 133, 138 (1991) (citation modified).  If "the motion for judgment notwithstanding the verdict is a motion that judgment be entered in accordance with the movant's earlier motion for directed verdict," such as here, "this Court has required the use of the same standard of sufficiency of evidence in reviewing both motions." *Id.* (citation modified).  "The trial court must construe the evidence in the light most favorable to the non-movant and resolve all evidentiary conflicts in the non-movant's favor." *Morris v. Scenera Rsch., LLC*, 368 N.C. 857, 861, 788 S.E.2d 154, 158 (2016).  Moreover, "we review this question of law de novo." *Id.* (citation modified).  "'Under a de novo review, the court considers the matter anew and freely substitutes its own judgment' for that of the lower tribunal." *Craig v. New*

*Hanover Cnty. Bd. of Educ.*, 363 N.C. 334, 337, 678 S.E.2d 351, 354 (2009) (citation modified).

"The party moving for judgment notwithstanding the verdict, like the party seeking a directed verdict, bears a heavy burden under North Carolina law." *Martishius v. Carolco Studios, Inc.*, 355 N.C. 465, 473, 562 S.E.2d 887, 892 (2002) (citation omitted). "To survive a motion for directed verdict or JNOV, the non-movant must present 'more than a scintilla of evidence' to support its claim." *Morris*, 368 N.C. at 861, 788 S.E.2d at 157–58 (quoting *Stark v. Ford Motor Co.*, 365 N.C. 468, 480, 723 S.E.2d 753, 761 (2012)); *Tomika Invs., Inc. v. Macedonia True Vine Pentecostal Holiness Church of God, Inc.,* 136 N.C. App. 493, 499, 524 S.E.2d 591, 595 (2000) ("The hurdle is high for the moving party as the motion should be denied if there is more than a scintilla of evidence to support the plaintiff's *prima facie* case."). Although "a scintilla is 'very slight evidence,' the non-movant's evidence must still 'do more than raise a suspicion, conjecture, guess, surmise, or speculation as to the pertinent facts in order to justify its submission to the jury.'" *Morris*, 368 N.C. at 861, 788 S.E.2d at 15 (citations omitted). "A directed verdict and judgment notwithstanding the verdict are therefore not properly allowed unless it appears, as a matter of law, that a recovery cannot be had by the plaintiff upon any view of the facts which the evidence reasonably tends to establish." *Scarborough v. Dillard's, Inc.*, 363 N.C. 715, 720, 693 S.E.2d 640, 643 (2009) (citation modified).

A products liability action grounded in tort has four essential elements: "(1) evidence of a standard of care owed by the reasonably prudent person in similar circumstances; (2) breach of that standard of care; (3) injury caused directly or proximately by the breach, and; (4) loss because of the injury." *Thomasville v. Lease-Afex, Inc.*, 300 N.C. 651, 656, 268 S.E.2d 190, 194 (1980) (citation omitted); *Crews v. W. A. Brown & Son, Inc.*, 106 N.C. App. 324, 329, 416 S.E.2d 924, 928 (1992) ("As with other negligence actions, the essential elements of a products liability action based upon negligence are (1) duty, (2) breach, (3) causation, and (4) damages.").

### 1. *Evidence of Battery*

Midwest argues that, because Plaintiff could not produce a specific receipt or a unique identifying label tying the green battery to Midwest, the evidence did not establish Midwest was the supplier. Midwest maintains that at best, "the jury could only speculate as to whether Midwest sold Plaintiff the battery that exploded in his pocket."

At trial, Plaintiff testified that he purchased an unlabeled green lithium-ion 18650 battery from Darth Vapor on 5 February 2019—approximately two months before the incident occurred. The CT scan conducted by Mr. Rondinone thereafter confirmed that the incident battery was green and was not manufactured by Samsung, Sony, or LG. Additionally, Mr. Marzola agreed that the incident battery was not manufactured by any of these major manufacturers.

Brian Caiazzo, the employee who ordered and maintained the inventory for Darth Vapor, testified that from 2018 through April 2019, "[a]ll batteries were purchased from . . . Midwest." Midwest's invoices confirmed it shipped 18650 batteries to Darth Vapor during the relevant timeframe. In fact, Darth Vapor purchased "LG HG2 3000Mah 2Pack 18650 3.7V Authentic" batteries from Midwest between January 2018 and January 2019 as follows: January 2018 – twenty batteries; February 2018 – twenty-five batteries; March 2018 – ten batteries; April 2018 – thirty batteries; May 2018 – ten batteries; June 2018 – ten batteries; July 2018 – thirty batteries; August 2018 – fifteen batteries; September 2018 – twenty-five batteries; November 2018 – twenty batteries; and January 2019 – twenty batteries. While these invoices do not indicate the color of the batteries, several witnesses noted that 18650 batteries are available in a multitude of colors, including green. Thus, the evidence supports an inference that Plaintiff purchased a green 18650 battery from Darth Vapor around two weeks after Darth Vapor had received a shipment of similar batteries from Midwest.

Although Midwest claimed that the batteries it sold to Darth Vapor were "authentic" batteries, Mr. Yasin conceded that Midwest did not source the batteries directly from a manufacturer; instead, Midwest sourced its 18650 batteries from E-Cig Fiend. Mr. Yasin further conceded that E-Cig Fiend does not manufacture batteries; is not a subsidiary of Samsung, Samsung SDI, or Sony; is not an authorized dealer for LG or Sony; and he never asked E-Cig Fiend where the batteries originated.

He also conceded that when he received shipments from E-Cig Fiend, the boxes did not contain any official logos or trademarks. Mr. Murphy corroborated that Midwest purchased its batteries from E-Cig Fiend. To his knowledge, E-Cig Fiend was not owned or operated by LG, Sony, or Samsung. Mr. Murphy added that when receiving shipments of batteries, they would arrive in unmarked white boxes without any logos or trademarks.

Here, the jury could reasonably infer that Plaintiff's green battery was part of Midwest's shipments to Darth Vapor, and that the batteries it sold to Darth Vapor were not the purported brand-name 18650 batteries. Plaintiff thus offered "more than a scintilla of evidence" to support his claim. *Morris*, 368 N.C. at 861, 788 S.E.2d at 157–58 (quoting *Stark*, 365 N.C. at 480, 723 S.E.2d at 761). Although Midwest correctly notes the absence of a direct match between a specific invoice and Plaintiff's battery, caselaw recognizes that "circumstantial evidence [may be] sufficient to take the case out of the realm of conjecture and into the field of legitimate inference from established facts . . . ." *Snow v. Duke Power Co.*, 297 N.C. 591, 597, 256 S.E.2d 227, 231–32 (1979) (citation omitted). Viewed in the light most favorable to the non-movant, the direct and circumstantial evidence, coupled with the attendant circumstances, supports an inference that Midwest was provided the incident battery. *Id.*; *see also generally Frazier v. Suburban Rulane Gas Co.*, 247 N.C. 256, 259, 100 S.E.2d 501, 503 (1957) (quoting *Fitzgerald v. S. Ry. Co.*, 141 N.C. 530, 534, 54 S.E. 391, 393 (1906)); *see also generally See Sneed v. Lions Club of Murphy, N.C.,*

*Inc.*, 273 N.C. 98, 101, 159 S.E.2d 770, 772 (1968). The trial court properly denied Midwest's motions for directed verdict and JNOV.

### 2.    *Sealed Container*

Midwest next argues the trial court should have directed a verdict—or entered JNOV—in its favor because, as a non-manufacturing seller, it acquired and sold the batteries in sealed containers, thereby barring liability under N.C. Gen. Stat. § 99B-2(a). Alternatively, Midwest maintains that even if the batteries were not in sealed containers, it had no reasonable opportunity to inspect them pursuant to subsection 99B-2(a).

A "seller" may not be held liable in a products liability action—"except an action for breach of express warranty"—if the seller acquired the product and sold it (1) "in a sealed container," or (2) "under circumstances in which the seller was afforded no reasonable opportunity to inspect the product in such a manner that would have or should have, in the exercise of reasonable care, revealed the existence of the condition complained of . . . ." *Id.* § 99B-2(a); *Jones v. GMRI, Inc.*, 144 N.C. App. 558, 562, 551 S.E.2d 867, 870 (2001). A seller "includes a retailer, wholesaler, or distributor, and means any individual or entity engaged in the business of selling a product, whether such sale is for resale or for use or consumption." N.C. Gen. Stat. § 99B-1(4) (2023).

With respect to a seller's duty to inspect, this Court has noted:

> that a seller of a product made by a reputable

> manufacturer, where he acts as a mere conduit and has no knowledge or reason to know of a product's dangerous propensities, "is under no affirmative duty to inspect or test for a latent defect, and therefore, liability cannot be based on a failure to inspect or test in order to discover such defect and warn against it."
>
> This rule is particularly sound where . . . the product is sold by the supplier in its original, sealed container.

*Sutton v. Major Prods. Co.*, 91 N.C. App. 610, 614, 372 S.E.2d 897, 900 (1988) (citation omitted).  Indeed, "where a product has a latent defect, the general rule of liability is that a distributor . . ., acting as a mere conduit of the product, is only liable for injuries caused by known dangers." *Id.* at 614, 372 S.E.2d at 899; *Ziglar v. E. I. Du Pont de Nemours & Co.*, 53 N.C. App. 147, 152, 280 S.E.2d 510, 514 (1981).  The "liability of a distributor or seller of goods depends on whether the seller knew or by the exercise of reasonable care, could have discovered the dangerous character or condition of the goods." *Sutton*, 91 N.C. App. at 613, 372 S.E.2d at 899 (citation modified).  Moreover, a non-manufacturing seller has the "duty to warn of hazards attendant to the assembled and installed product's use but only when the seller 'has actual or constructive knowledge of a particular threatening characteristic of the product' and simultaneously 'has reason to know that the purchaser will not realize the product's menacing propensities for himself.'" *Crews*, 106 N.C. App. at 330, 416 S.E.2d at 928 (citation omitted).

Midwest contends that because it received the 18650 batteries in individual white boxes from its supplier and shipped them to Darth Vapor in that same

packaging, it received the products in "sealed container[s]." Yet Plaintiff's evidence tended to show that the 18650 batteries arrived in loose, individual white boxes that were not shrink-wrapped; Midwest added that when battery shipments arrived, it opened some of the boxes for "spot-check" inspections. Moreover, Midwest did not obtain its 18650 batteries from a "reputable manufacturer," as both Mr. Yasin and Mr. Murphy conceded that Midwest sourced them from E-Cig Fiend—which does not manufacture batteries, neither is it a subsidiary of a major manufacturer nor an authorized dealer for a major manufacturer. *Ziglar*, 53 N.C. App. at 152, 280 S.E.2d at 514. The jury could therefore reasonably infer that the batteries did not arrive in sealed packages and were not sourced from a reputable manufacturer.

The evidence also supports an inference that Midwest was afforded a "reasonable opportunity to inspect the product in such a manner that would have or should have, in the exercise of reasonable care, revealed the existence of the condition complained of . . . ." N.C. Gen. Stat. § 99B-2(a); *Sutton*, 91 N.C. App. at 613, 372 S.E.2d at 899. The evidence also supports the inference that Midwest had "knowledge or reason to know of [the] product's dangerous propensities" when used in electronic cigarettes. *See Sutton*, 91 N.C. App. at 614, 372 S.E.2d at 900 (citation omitted). As noted above, Mr. Murphy testified that when Midwest received products from suppliers, its employees would "spot-check" the boxes as they came in. Moreover, Mr. Murphy noted that the batteries did not contain a warning "not to use it in a . . . device." But around March 2019, Midwest became "aware that [the major

manufacturers of 18650 batteries] were saying" the batteries should not be used in vaping devices.

To that end, Mr. Rondinone noted that the major manufacturers of these batteries "take a very strong position that these batteries should never be sold to an end consumer" for the purposes of vaping:

> Q. Okay. I guess, do [the major manufacturers] take a position on whether their 18650 [batteries] should ever be used individually or by a consumer in any application?
>
> A. Yeah. They take a very strong position that these batteries should never be sold to an end consumer for a replaceable-battery use. They're all very, very specific, and which obviously includes vaping, which I think they specifically prohibit as well. But they're very specific that they're only intended for battery-pack manufacturers or people who integrate them into a protective pack.

And Mr. Marzola conceded that the major manufacturers have been telling people not to use these batteries for the purposes of vaping since as early as 2015:

> Q. And in the course of your work with these batteries, you agree with me that those three manufacturers we've been talking about, those are the major manufacturers of these types of batteries, are they not?
>
> A. They're a large percentage. Yes. Yeah.
>
> Q. And you would agree with me that all three of them specifically tell people not to use these batteries for this very specific use, vaping?
>
> A. They do now. Yes.
>
> . . . .
>
> Q. Sony 2015, any reason to agree or disagree with that?

A. No, none at all.

Q. LG, 2016/'17, any reason to disagree with that?

A. I think it was late '17, but agreed. I think that's when they first started talking about that. Yes.

In fact, Mr. Marzola conceded that authentic 18650 batteries manufactured by Sony and LG expressly warn against using the product outside of a battery pack or in a vaping device:

> Q. And in the course of your work, you have also seen where authentic Sony batteries have a warning on the wrapper, don't they?
>
> A. That is accurate.
>
> . . . .
>
> Q. -- and it says "Do not use this battery outside of a battery pack" or something to that effect?
>
> A. That is true. They do. Yes. It is . . . stamped on it. Yeah.
>
> Q. So if it was a real Sony battery, it would have that language on it?
>
> A. I will say yes, for sure. But I've also seen it where a nonauthentic had the same warning, to be honest with you.
>
> Q. You would agree with me . . . that at some point . . . LG started putting a warning on its wrappers that said: "Do not use this in an e-cigarette." You've seen that?
>
> A. I have seen that in picture only. I've actually never physically had one that I can recall photographing. But yes. That . . . improper use warning, is allegedly now appearing on that HG2, that LG cell. Yes.
>
> Q. So authentic LG batteries have that warning on them, as far as you know?

A. As far as I know. . . .

Q. And in the context of your hearing about that or having knowledge about that, you've got no reason to disagree that LG's position is that they've been doing that since 2017?

A. That's what I've been told.

Q. So at least LG's position is that if it's actually their battery, authentic, since 2017 it would have that warning on the wrapper?

A. That's what they've been telling me. Yes. Yeah.

There is sufficient evidence supporting the inference that Midwest had a reasonable opportunity to inspect the batteries, had knowledge of the batteries' explosive propensities when used in vaping devices, had knowledge that the batteries it was purchasing from E-Cig Fiend were not authentic, and had knowledge that the batteries did not warn against using them in electronic cigarettes. N.C. Gen. Stat. § 99B-2(a). Although the individual white boxes contained other warnings, a reasonable inspection of the batteries could have—at a minimum—revealed the absence of such a necessary warning accompanying the product. *See id.* A reasonable jury could find that Midwest was not merely an innocent conduit, but had reason to know the batteries posed a significant explosion risk and lacked the necessary warning. Accordingly, the trial court properly submitted this matter to the jury rather than granting Midwest's motion for a directed verdict. *Walker*, 320 N.C. at 733, 360 S.E.2d at 799. And once the jury resolved that dispute in Plaintiff's favor, the trial court did not err in denying Midwest's motion for JNOV. *Davis*, 330 N.C. at

314, 411 S.E.2d at 138; *Scarborough*, 363 N.C. at 720, 693 S.E.2d at 643. This assignment of error is overruled.

## B.  Motion to Bifurcate

Midwest contends the trial court abused its discretion by refusing to bifurcate the liability and damages phases of trial under N.C. Gen. Stat. § 1A-1, Rule 42(b)(3). More specifically, Midwest maintains the trial court abused its discretion by denying its motion to bifurcate on the basis of "good cause shown." *Id.*  We disagree.

"The severance of issues for separate trials is in the trial court's discretion, and its decision will not be reviewed absent an abuse of discretion[.]" *Clarke v. Mikhail*, 243 N.C. App. 677, 694, 779 S.E.2d 150, 163 (2015) (quoting *Ashley v. Delp*, 59 N.C. App. 608, 610, 297 S.E.2d 905, 908 (1982)) (alteration in original); *Headley v. Williams*, 162 N.C. App. 300, 307, 590 S.E.2d 443, 448 (2004) ("The decision to bifurcate a trial in furtherance of convenience or to avoid prejudice is left to the discretion of the trial court."). "An abuse of discretion occurs when the trial court's ruling 'is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision.'" *Feeassco, LLC v. The Steel Network, Inc.*, 264 N.C. App. 327, 334, 826 S.E.2d 202, 208 (2019) (citation omitted).

Rule 42(b)(3) provides that in a tort action exceeding $150,000, the court "shall" order separate trials on the issues of liability and damages:

> Upon motion of any party in an action in tort wherein the plaintiff seeks damages exceeding one hundred fifty thousand dollars ($150,000), *the court shall order separate*

> *trials for the issue of liability and the issue of damages, unless the court for good cause shown orders a single trial.* Evidence relating solely to compensatory damages shall not be admissible until the trier of fact has determined that the defendant is liable. The same trier of fact that tries the issues relating to liability shall try the issues relating to damages.

N.C. Gen. Stat. § 1A-1, Rule 42(b)(3) (emphasis added). While Rule 42(b)(3) states "the court shall order separate trials," *id.*, "a motion to bifurcate may be denied 'for good cause shown.'" *Clarke*, 243 N.C. App. at 694, 779 S.E.2d at 163 (quoting N.C. Gen. Stat. § 1A-1, Rule 42(b)(3)).

It is undisputed that Plaintiff sought greater than $150,000 in damages from Defendants collectively, including Midwest. The trial court, however, denied Midwest's motion to bifurcate on the basis of good cause shown. *See Clarke*, 243 N.C. App. at 694, 779 S.E.2d at 163 (citation omitted) ("This Court is not called upon to determine whether the facts of this case support a showing of good cause; instead, we are asked to review the trial court's reasoning to determine whether its finding of good cause was manifestly unsupported by reason or . . . so arbitrary that it could not have not have been the result of a reasoned decision.").

Midwest takes issue with the following portions of the trial court's good cause determination:

> Defendants herein have not stipulated that plaintiff was injured as a direct and proximate result of defendant's alleged negligence and thus . . . plaintiff has not been relieved of his respective burdens of proof with respect to injury or causation.

- 24 -

> . . . .
>
> Jury confusion and potential prejudice to Plaintiff in that in a bifurcated proceeding, jurors would necessarily hear of acts but not the consequences thereof especially of alleged injuries (burns to leg) that may not be readily apparent to jurors who may in turn reasonably question why or whether a legal claim even exists[.]

Midwest maintains neither of these reasons support denying its motion to bifurcate on the basis of good cause, arguing: "It is hard to imagine why it would have been necessary for jury trial proceedings if Midwest had" entered such a stipulation; and "the manner in which Plaintiff presented himself to the courtroom was not a basis to deny statutory bifurcation[.]"

Even if these reasons are unsupported as Midwest asserts, the trial court provided a battery of *other reasons* underlying its good cause determination, none of which Midwest contests on appeal. Among those reasons: "[b]ifurcation reduces the likelihood of juror sympathies on the issue of liability"; "[b]ifurcation may save time in the event one or more of the defendants herein is/are not liable to plaintiff"; "[a] single proceeding promotes judicial economy and efficiency by eliminating duplicative witnesses, and redundant procedures"; "[b]ifurcation . . . represents the likelihood of increased scheduling burdens . . . as well as the likelihood of increased expense to taxpayers"; [t]he "absence of cross-claims or counterclaims"; "[t]he parties' forecasts as to the number of witnesses and expected length of testimonies for the liability and damage portions respectively"; "[d]ifficulties in confining or tailoring jury selection

consistent with bifurcation"; and "[t]he issues of liability and damages herein appear sufficiently interwoven." The trial court thus concluded "that bifurcation in this particular litigation will not reasonably assist in a clarification or simplification of issues nor achieve a more fair or expeditious resolution of this action."

The trial court considered the possibility of duplicative testimony in the event of bifurcation since Plaintiff identified several witnesses who would be forced to testify twice. The trial court also considered the economic impact of duplicative proceedings insofar as bifurcation would require "multiple closing arguments, multiple opening statements, multiple jury charges, multiple charge conferences, [and] multiple jury deliberations." Thus, even disregarding the contested portions of the trial court's order, Midwest "has failed to carry [its] burden to show the trial court's 'finding of good cause in this specific case was manifestly unsupported by reason . . . or so arbitrary that it could not have been the result of a reasoned decision.'" *Id.* at 695, 779 S.E.2d at 163 (citation omitted). We therefore hold the trial court did not abuse its discretion by denying Midwest's motion to bifurcate. *Id.* at 694, 779 S.E.2d at 163.

## IV. Conclusion

For the above reasons, we conclude the trial court properly denied Midwest's directed verdict and JNOV motions. Additionally, the trial court did not abuse its discretion by declining to bifurcate the liability and damages phases of trial.

Accordingly, we affirm the trial court's judgment and its orders denying Midwest's motions.

AFFIRMED.

Judges HAMPSON and FLOOD concur.

Report per Rule 30(e).